ANDERSON, Circuit Judge:
In this case, Cynthia Coffin attempted to shut her open garage door to prevent two Sarasota County Sheriffs deputies, James Lutz and Stacy Brandau, from serving a court order on her husband, John Coffin.[1] As Ms. Coffin attempted to close the open garage door, Brandau stepped into the threshold, breaking the electronic-eye safety beam on the garage door and causing the door to retreat to its open position. The Deputies, who did not possess either a search warrant or an arrest warrant, entered the Coffins’ attached open garage and arrested Ms. Coffin for obstruction of justice. The Coffins then sought damages against Lutz and Brandau under 42 U.S.C. § 1983 on the grounds that the Deputies’ warrantless entry into their garage and Ms. Coffin’s arrest violated their Fourth Amendment rights.
The Deputies argued that qualified immunity shielded them from liability. Respecting the only two claims before the court — Ms. Coffin’s challenge to her arrest and both Plaintiffs’ challenge to the Deputies’ entry into the garage — the district court granted summary judgment to the Deputies. The district court concluded that, although the Deputies violated the Coffins’ Fourth Amendment rights by entering the garage, that right was not clearly established. And because there was at least arguable probable cause to arrest Ms. Coffin for obstructing service of legal process, the Deputies were entitled to qualified immunity on both Ms. Coffins’ arrest claim and on the Plaintiffs’ challenge to the entry into the garage. On initial appeal, we affirmed. Coffin v. Brandau, 609 F.3d 1204 (11th Cir.2010).
*1004 This court then vacated that decision and granted rehearing en banc to address whether the warrantless seizure of Ms. Coffin inside her garage by Deputies Brandau and Lutz violated the Coffins’ Fourth Amendment rights and, if so, whether those rights were clearly established when this incident occurred, such that the Deputies should be stripped of qualified immunity. Coffin v. Brandan, 614 F.3d 1240 (11th Cir.2010). We hold that although the Deputies’ entrance into the garage did violate the Coffins’ Fourth Amendment rights, the boundaries of the right violated here were not clearly established and, thus, the Deputies are entitled to qualified immunity. Accordingly, the district court properly granted summary judgment in favor of the Deputies both on Ms. Coffin’s arrest claim and on the Plaintiffs’ challenge to the entrance of the garage.

1. Facts

Deputy Lutz arrived at the Coffins’ home on April 18, 2006, shortly before 6:30 PM, during daylight hours. Lutz was there to serve Mr. Coffin with an Order of Temporary Injunction Against Repeat Violence, which Mr. Coffin’s tenant had obtained six days earlier from the Circuit Court for Charlotte County, Florida.[2] The injunction required Mr. Coffin to surrender any firearms or ammunition in his possession to the Sarasota County Sheriff and - ordered “[t]he Sheriff of Sarasota County, or any other authorized law enforcement officer ... to serve this temporary injunction upon Respondent as soon as possible after its issuance.”
The Coffins’ home faces the street and is in close proximity to the sidewalk. The attached garage also faces the street and was fully open at the time Deputy Lutz arrived, exposing its interior. The driveway leads directly from the street to the garage, and a pathway veers left from the driveway up to the front door. Between the front door and the garage, the house has a large front bay window which had its curtains drawn open at the time Lutz arrived.
Upon his arrival, Lutz approached the Coffins’ front door and rang the bell. Cynthia Coffin answered the door and Lutz explained that he had papers to deliver to Mr. Coffin.[3] Ms. Coffin responded that Mr. Coffin was in the bathroom and Lutz would have to wait. She then shut and locked the front door. After waiting a few minutes, Lutz walked back down the pathway facing the front bay window and, believing he had made eye contact with Ms. Coffin through the window, waved the paperwork above his head as a reminder that he was waiting. Under the impression that Ms. Coffin had seen him, Lutz walked back up to the front door expecting her to open it and give him an update. As he approached the front door, he overheard a man’s voice asking, “What did he want?” Lutz then either rang the bell or knocked on the front door for a second time but received no answer. He then walked up to the front window to try to *1005 get the Coffins’ attention. Ms. Coffin, upset that Lutz was walking through her bushes, began shouting for him to get out of her bushes and off her property and threatened to call the police. Lutz backed up from the window and walked over to his patrol car, parked on the street at the driveway, in order to call for backup because he felt the Coffins were trying to avoid service and there was a possibility of obstruction.
About five to eight minutes after calling for backup, Deputy Brandau arrived at the scene. Around the time of Brandau’s arrival, Lutz saw a man that he assumed was Mr. Coffin through the front window.[4] Brandau was on the phone with her supervisor while Lutz was apprising her of the situation at the Coffin house.
According to Lutz, the Deputies were standing in front of the open garage door while Brandau was talking on the phone with a supervisor about what to do next when they heard the interior garage door open and close and the rolling garage door start to close. Brandau interrupted the phone call, and walked into the open garage, tripping the electronic sensor and causing the garage door to retreat to its open position. Lutz followed, and saw Brandau go and knock on the interior door from the garage to the kitchen, whereupon Ms. Coffin came out into the garage and yelled at both Deputies to get off her property. Brandau announced to Ms. Coffin an intention to arrest her for obstructing service of process.
According to Ms. Coffin, she opened the door from the kitchen to the garage, reached out and pushed the automatic button to close the garage door, at which time she saw Brandau followed by Lutz walk into the garage and trip the electronic sensor causing the garage door to return to its open position. She then walked into the garage to talk with Brandau, feeling more comfortable talking to a female.[5]
The parties agree that the Deputies attempted to arrest Ms. Coffin for obstruction of service of process and that a struggle ensued as the Deputies attempted to handcuff Ms. Coffin. The struggle began between the Deputies and Ms. Coffin in the garage, and when Mr. Coffin intervened included both Deputies and both Coffins and expanded from the garage to the house.[6] Additional deputies arrived and both Mr. and Ms. Coffin were ulti *1006 mately arrested.[7]
We are no longer required to follow the two-step process once mandated by Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Thus, we are free to address the question of whether the facts that the plaintiff alleged showed a violation of a constitutional right or the question of whether the right at issue was clearly established in the order most appropriate for the case at hand.
As noted, the Coffins present only two claims. Both Coffins challenge the Deputies’ entry into the garage; only Ms. Coffin challenges her arrest.[8] We address first Ms. Coffin’s claim for an unlawful arrest. Then we address whether the entry into the garage violated the Coffin’s Fourth Amendment rights. Because we conclude that the entry did violate Fourth Amendment rights, we address finally whether there was a violation of clearly established Fourth Amendment law.

II. Ms. Coffin’s Claim for Unlawful Arrest

Deputies are entitled to qualified immunity on claims of false arrest so long as they had probable cause or arguable probable cause for the arrest. See Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002). We easily conclude that the Deputies had ample probable cause to arrest Ms. Coffin for misdemeanor obstruction of justice. At the very least, they had arguable probable cause for arrest, which is all that is required for qualified immunity purposes. Id. at 1195. The difficulty with the arrest in this case turns not on the probable cause question, but on the question of whether the officers were entitled to enter the garage in order to make that warrantless arrest. See Minnesota v. Olson, 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990) (“It was held in Payton v. New York that a suspect should not be arrested in his house without an arrest warrant, even though there is probable cause to arrest him.”) (citation omitted); United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir.1986) (“A finding of probable cause alone ... does not justify a warrantless arrest at a suspect’s home.”). For the reasons discussed below, we hold that it was not clearly established that the garage entry here would violate the Fourth Amendment, and because the Deputies had probable cause to arrest Ms. Coffin for obstruction, they are entitled to qualified immunity on this claim.
Probable cause to arrest exists under both federal and Florida law when an arrest is “objectively reasonable based on the totality of the circumstances.” Lee, 284 F.3d at 1195. “This standard is met when the facts and circumstances within the officer’s knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the *1007 suspect has committed, is committing, or is about to commit an offense.” Id. (citations and quotations omitted). Probable cause requires more than a mere suspicion, but not the level of convincing proof necessary to support a conviction. Id. Arguable probable cause exists where reasonable officers in the same circumstances and with the same knowledge as the defendant could have believed that probable cause existed. Id.
Florida provides for service of process to be made only on the person to be served, their spouse, or a person above the age of fifteen living with respondent.[9] Florida statutory law provides no other methods for serving an individual; unlike some states, Florida statutes do not provide for proper service of process to be made by affixing a copy to the door of the residence and following up with a mailed copy. Compare Fla. Stat. Ann. § 48.031 (West 2011) with N.Y. C.P.L.R. § 308 (McKinney 2010) (providing for “nail and mail” service and for service “in such manner as the court, upon motion without notice, directs, if service is impracticable under paragraphs one, two and four of this section”).
Under Florida law, a person has the legal obligation to accept service of process when service is attempted reasonably. See Haney v. Olin Corp., 245 So.2d 671, 673 (Fla. 4th DCA 1971) (“An officer’s reasonable attempt to effect personal service of process upon a person in his own home, when the person reasonably should know the officer’s identity and purpose, cannot be frustrated by the simple expedient of the person closing the front door in the officer’s face and wilfully refusing to accept service of process.”). While there are some Florida cases that have indicated that courts will accept less than personal service in the event that people attempt to avoid service, the law in this area is quite sparse and certainly could not clearly establish under what circumstances a lesser method of service is acceptable. See, e.g., Haney, 245 So.2d at 672-74 (holding that, where deputy sheriff observed husband standing in doorway and wife fled back to the home’s front door yelling “no” and closed the door after sheriff identified himself as present to serve process, deputy sheriffs actions of identifying himself in a loud voice, announcing he had copies of summons, reading them loudly outside the door, and announcing he was leaving them on the doorstep was sufficient delivery of papers to effect valid service of process); Liberman v. Commercial Nat’l Bank of Broward Cnty., 256 So.2d 63, 63-64 (Fla. 4th DCA 1971) (holding that personal service was perfected on defendant where deputy sheriff observed the defendant retrieve papers left in his mail box after attempting to avoid service by running away from process server into his home but noting that “this approaches outer limits”).
Lutz, a fully uniformed Sarasota Sheriffs deputy arrived at the Coffins’ house with a validly executed restraining order and temporary injunction against repeat violence, which under Florida law is somewhat different from an ordinary summons and complaint. He testified in his deposition that restraining orders must be *1008 served on the person named therein and that he had never simply left a restraining order at a residence or performed substitute service on a different person present at the residence.
The notion that serving a restraining order should be treated differently than serving ordinary process finds some support both in Florida’s procedural rules and in the language used in Section 784.046. With regard to restraining orders in actions by victims of repeat violence, the relevant Florida procedural rules provide that there must be personal service and that service can be made only by a law enforcement officer. See Fla. R. Fam. Law R. Proc. 12.610(b)(2)(B) (with respect to a petition for repeat violence “[pjersonal service by a law enforcement agency is required”); see also Fla. R. Fam. Law. R. Proc. 12.160(c)(3)(A) (“A temporary injunction for protection against ... repeat violence ... must be personally served.”) (emphasis added). By contrast, service of other documents need not be served by a law enforcement officer. See Fla. Stat. Ann. § 48.021 (outlining the general guidelines for who may serve process).[10] Section 784.046 also provides, with respect to restraining orders concerning repeat violence, that after the clerk of court furnishes a copy of the documents to a law enforcement officer, the officer “shall serve it upon the respondent as soon thereafter as possible on any day of the week and at any time of the day or night.” Fla. Stat. Ann. § 784.046(8)(a)(l) (emphasis added). The few Florida cases that allowed for some alternative form of service involved delivery of a standard summons and complaint, and not a repeat violence petition and restraining order that required the securing of firearms.[11]
In Lutz’s first interaction with Ms. Coffin, at the front door of the Coffin home, Lutz clearly stated his legitimate reason for being on their property — to serve Mr. Coffin with this restraining order. At that time, Ms. Coffin unequivocally indicated that Mr. Coffin was home but that Lutz would have to wait. After waiting a few minutes, with no contact from either of the Coffins, Lutz tried to get Ms. Coffin’s attention through the front window, assuming this would prompt her to offer an update. Ms. Coffin, aware that Lutz had paperwork that he had described as important, then began yelling at Lutz through the front window to get out of her bushes and off her property. And her attempt to close the garage door appeared to the Deputies as a further effort to avoid service.
It reasonably appeared to the Deputies that Ms. Coffin tried to thwart the Deputies’ ability to serve process on Mr. Coffin, *1009 and, thus, they had probable cause to arrest her for obstruction of justice, setting aside for the moment any Fourth Amendment implications arising from the Deputies’ entry into the garage, as noted in the next paragraph.[12] Obstruction of service of process is a misdemeanor offense. Fla. Stat. Ann. § 843.02.[13] The obstruction occurred in the presence of the officers, and they were thus authorized to make an arrest without a warrant, immediately or in fresh pursuit. Fla. Stat. Ann. § 901.15 & (1) (“A law enforcement officer may arrest a person without a warrant when [t]he person has committed a felony or misdemeanor or violated a municipal or county ordinance in the presence of the officer. An arrest for the commission of a misdemeanor or the violation of a municipal or county ordinance shall be made immediately or in fresh pursuit.”).
For the reasons discussed below in Part TV of this opinion, although the Deputies’ entry into the Coffins’ garage violated their Fourth Amendment rights, there was not a violation of clearly established law. Thus, the Deputies are entitled to qualified immunity with respect to the entry and the entry does not deprive the Deputies of qualified immunity for the otherwise lawful arrest of Ms. Coffin.

III. Entry of the Garage; the Fourth Amendment is Violated

The Fourth Amendment protects “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. Const, amend. IV. “[Pjhysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.” Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379-80, 63 L.Ed.2d 639 (1980) (citation and quotations omitted); Riggs v. State, 918 So.2d 274, 277 (Fla.2005) (quoting Payton). Never is the Fourth Amendment “zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual’s home.” Payton, 445 U.S. at 589, 100 S.Ct. at 1381-82.
The Coffins argued both in the district court and on appeal that their open adjacent garage was part of “the unambiguous physical dimensions” of their home and, therefore, was entitled to the absolute protection of a home under Payton. The difficulty with this argument is that, while the garage here is attached, is covered by a compatible hip roof, and does share one common wall with the house, it is different from the living areas of the home that are easily categorized as part of the “unambiguous physical dimensions” of the home. The garage has a very large exterior door facing the street that was left fully raised, thus exposing the interior to any neighbors or passersby. The garage was not open *1010 only momentarily in order for a car to enter; it was open from before the Deputies arrived until the moment Ms. Coffin attempted to close it. In contrast with the abundance of case law reiterating the high level of Fourth Amendment protection afforded a home, case law addressing the Fourth Amendment status of an attached but open garage is quite sparse, not only in Florida but throughout the country.
The Coffins rely primarily on Payton, its predecessors, and progeny for their argument that the Deputies violated the Fourth Amendment when they entered the garage. The cases they cite, for example, Kirk v. Louisiana, 536 U.S. 635, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002), Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), and Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), all reiterate the principle that homes are entitled to the greatest Fourth Amendment protection. See Kirk, 536 U.S. at 638, 122 S.Ct. at 2459 (“As Payton makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.”); Oliver, 466 U.S. at 178, 104 S.Ct. at 1741 (“[T]he Court since the enactment of the Fourth Amendment has stressed the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.”) (citation and quotations omitted); Silverman, 365 U.S. at 511, 81 S.Ct. at 683 (“At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.”). These cases, however, do not address the crucial question in this case, which is whether an open attached garage is entitled to the same level of protection. Despite the dissent’s repeated insistence, Payton simply did not involve a garage at all. Thus, Payton made no holding with respect to whether an attached open garage is part of the home.
Both the United States Supreme Court and our Court have, in some circumstances, extended Fourth Amendment protection to garages, see Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932); United States v. Sokolow, 450 F.2d 324 (5th Cir.1971) (per curiam); Kauz v. United States, 95 F.2d 473 (5th Cir. 1938). However, these cases are distinguishable from the instant case and, therefore, do not control our outcome today.
In Taylor v. United States, the Supreme Court held that whiskey recovered by officers from a closed and locked garage should have been suppressed as the product of an unreasonable search. 286 U.S. at 5-6, 52 S.Ct. at 467. The officers, after smelling whisky emanating from the garage and seeing a number of cardboard boxes that appeared to contain jars of liquor by peering through a small opening, “broke the fastening upon a door,” forcibly entering the once locked garage. Id. at 5, 52 S.Ct. at 467. Taylor thus holds that a garage is entitled to Fourth Amendment protection when it is closed and locked, maintaining the owner’s expectation of privacy, but says nothing about an open garage.
Likewise, Sokolow, which also extended Fourth Amendment protection to a garage cannot control the outcome of this case. In Sokolow, a police officer followed a car suspected to contain stolen cigarettes to the Sokolow residence where the car “backed up to Sokolow’s garage.” 450 F.2d at 325. “While arresting the suspect, the officer saw a number of air conditioning units stacked in the garage.” Id. The officer then entered the garage and recorded serial numbers from the air conditioning units without a search warrant. Id. The facts of Sokolow do not make *1011 clear whether the garage door was open or whether the officer could see into the closed garage through a window. See id.
The fact that the Coffins’ garage was left open for an indefinite period of time is a crucial fact in this case. Sokolow, with its cursory statement of facts, is wholly insufficient to control our analysis here. Further, the garage in Sokolow, even if open, did not have a visible passageway from the outer threshold of the garage through to an interior access door of the home, and the officer did not enter to use such a pathway in order to knock on the interior door and make contact with the homeowner, as the Deputies did here. See id.[14]
Finally, Kauz does not control. In Kauz, two officers were patrolling a neighborhood and noticed a car known to be a “liquor car” in front of a garage “which was open about three feet.” Kauz, 95 F.2d at 473-74. The officers then witnessed Butler, one co-defendant, exit the garage carrying a five-gallon jug in a sack and put it into the car alongside two other identical jugs. Id. at 474. Butler saw the officers and tried to reenter the garage. One officer followed Butler into the garage, brought him back outside, and arrested him. Someone then closed and bolted the garage from the inside. Following this, the other officer then “broke in the [front] door, entered appellant’s living quarters, went through them, forced his way into the garage, and there saw appellant.” Id.
The Kauz Court held that the testimony of the officers (plural) was inadmissible, indicating that, in addition to the second officer’s forcible entry into the home in violation of the Fourth Amendment, the first officer’s entry of the garage was also a Fourth Amendment violation. Id. Kauz is distinguishable in much the same way as Sokolow. There is no indication in the opinion that the interior door was visible at all from the driveway; the garage door was open only about three feet. Accordingly, Kauz makes no holding with respect to an officer entering an open garage to knock on a visible access door to the home. Further, while the Court excluded the testimony of both officers, the focus of the Court’s rationale and holding was the second officer who “broke in the door, entered appellant’s living quarters, went through them, [and] forced his way into the garage.” Id. (“There is no doubt whatever that on the facts appearing in the record the search of appellant’s premises was forcibly made without either a search warrant or authority and violated her constitutional rights under the Fourth and Fifth Amendments.”). Thus, Kauz cannot control this case.
Taylor, Sokolow, and Kauz establish that Fourth Amendment protection is afforded to certain garages under certain circumstances, but they cannot and do not control the answer to the question of whether this garage was entitled to Fourth Amendment protection under the circumstances of this case.
*1012 It is well-established that police officers can enter onto residential property, including portions that would be considered part of the curtilage, in order to carry out legitimate police business. 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(f) (4th ed. 2004) (“Thus, when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g. walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.”) (and the cases cited therein). “This is because a portion of the curtilage, being the normal route of access for anyone visiting the premises, is only a semi-private area.” LaFave § 2.3(f) (quotations omitted).
In carrying out their duties, the police are free to go where the public would be expected to go. See LaFave § 2.3(c) (“Thus, courts have held that police with legitimate business may enter areas of the curtilage which are impliedly open to use by the public.”) (quotations omitted); Florida v. Detlefson, 335 So.2d 371, 372 (Fla. 1st DCA 1976) (“It cannot be said [that] the defendant had a reasonable expectation of privacy in the front porch of his home where, presumably, delivery men and others were free to observe the plants thereon.”); Tracht v. Comm’r of Pub. Safety, 592 N.W.2d 863, 865 (Minn.App.1999) (“Police with legitimate business may enter the areas of curtilage which are impliedly open to use by the public.”); State v. Duhart, 810 So.2d 972, 973-74 (Fla. 4th DCA 2002) (holding that there was no reasonable expectation of privacy in an attached carport (initially referred to as a garage) which is open and exposed to the public, comparing the situation to Detlefson’s front porch where delivery men were free to go); see also United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir.2006) (“The Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen’s door for legitimate police purposes unconnected with a search of the premises.”); id. (“[OJfficers are allowed to knock on a residence’s door or otherwise approach the residence seeking to speak to the inhabitants just an [sic] any private citizen may.”) (citation and quotations omitted) (mistake in Taylor).
We need not decide in this case whether entering an open garage in order to utilize a passageway to gain access to a visible door to the home is a violation of the Fourth Amendment. We hold, however, that, under the totality of the circumstances, the Deputies’ entry into the Coffins’ garage was a violation of the Fourth Amendment. The garage here is attached to the home itself, putting it in closer proximity to the home than an unattached garage. In contrast with a carport, the attached garage has walls on three sides and has the capability, if the outside door is rolled down, of being closed to maintain privacy. Ms. Coffin also attempted to exercise her Fourth Amendment rights. In her first conversation with Lutz, she explained that her husband might need a while before he would be able to come to the door. Lutz expressed his willingness to wait, and Ms. Coffin, by closing and locking the front door, indicated that she was maintaining her privacy in the meantime. Following this encounter, when Ms. Coffin noticed Lutz walking up to her window through her bushes, she screamed at him to get out of her bushes and off her property and threatened to call the police. Finally, and most significantly, when Lutz and Brandau remained on the property, Ms. Coffin attempted to close the garage door in order to maintain privacy in that *1013 area as well. Under these circumstances and in light of Ms. Coffin’s indications that she intended to maintain privacy, we hold that entering the garage as Ms. Coffin attempted to close it was a violation of the Fourth Amendment.

IV. Qualified Immunity

We must next address whether, on the pertinent date, it was already clearly established by preexisting law that entering the Coffins open garage in the face of Ms. Coffins’ attempts to exercise her Fourth Amendment privacy rights, including her request that the Deputies leave the property and her attempt to close the garage door, would violate the Fourth Amendment. We hold that the Deputies did not violate clearly established Fourth Amendment law.
In qualified immunity cases, this Court must “determine whether the right was clearly established such that a reasonable official would understand that what he is doing violates that right.” Bashir v. Rockdale Cnty., Ga., 445 F.3d 1323, 1327 (11th Cir.2006) (citation and quotations omitted). Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law. Id. at 1330-31; Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir.2002). “The critical inquiry is whether the law provided [the Deputies] with ‘fair warning’ that [their] conduct violated the Fourth Amendment.” McClish v. Nugent, 483 F.3d 1231, 1248 (11th Cir.2007) (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002)). It is important to emphasize that this inquiry “ ‘must be undertaken in light of the specific context of the case, not as a broad general proposition.’ ” Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)). Our Court looks only to binding precedent — cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose— to determine whether the right in question was clearly established at the time of the violation. See Amnesty Int’l, USA v. Battle, 559 F.3d 1170, 1184 (11th Cir.2009).
The Coffins argue that Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94, (2001), equates a garage with a home and clearly establishes that they are entitled to Fourth Amendment protection in their garage. The word garage appears in Kyllo only one time, and, in the very sentence in which it appears, the Supreme Court expressly distinguished between a garage and a home. See id. at 30, 121 S.Ct. at 2041 (“The scan showed that the roof over the garage and a side wall of petitioner’s home were relatively hot compared to the rest of the home.”). Had the Supreme Court meant to equate a garage with a home, the Court would have said “roof and sidewall of the garage.” It did not say that. Rather, it said “roof over the garage and sidewall of the home.”
Additionally, and significantly, in Kyllo, the police conducted a thermal-imaging scan of the entire home. Only by scanning the entire home and the homes of neighbors were the police able to ascertain that certain portions of the premises — mainly the roof over the Kyllo’s garage and the side wall of the home — were hot by comparison to the rest of their home and the homes of their neighbors. See id. (noting that certain areas were “relatively hot as compared to the rest of the home,” thus making clear that the entire home was searched with the thermal-imaging scan so that the relative heat of the several areas could be compared). The police intrusion was into the home itself, as well as the *1014 garage. Because there was an intrusion into the specially-protected space of the home, there was no further need to consider the garage. And in fact, the opinion made no further mention of the garage. In sum, the Supreme Court in Kyllo had no occasion to, and did not, address the extent to which an attached garage should share the Fourth Amendment protection of the home.
Although some courts have suggested that the Fourth Amendment protection attached to the garage is the equivalent of the protection provided the home itself, see, e.g., United States v. Oaxaca, 233 F.3d 1154, 1157 (9th Cir.2000), other courts and jurists have suggested otherwise. See Oaxaca, 233 F.3d 1154, 1159 (Graber, J., dissenting) (“Oaxaca had willingly left the garage door wide open. The garage is small, while its door is huge; and the garage faces the street at close range, so opening it exposed most of the interior to ready public view. These facts make this case closer to United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)....”); Daughenbaugh v. City of Tiffin, 150 F.3d 594, 603 (6th Cir.1998) (“[T]he divergent conclusions reached by the district court and this court concerning the status of Daughenbaugh’s garage is further indication that reasonable minds can differ on whether it should be considered as part of the curtilage.”); United States v. Knight, 451 F.2d 275, 278 (5th Cir.1972) (“Nothing in the officers’ conduct when they entered the property can be considered a search. Officer Wade, without his gun drawn, walked to the site of human activity, which was the garage adjoining the residence.”); cf. United States v. Wright, 449 F.2d 1355, 1362 (D.C.Cir. 1971) (“A garage is not a house, nor is it a dwelling or a home.... certainly the protection afforded is something less than that afforded [a] dwelling.”).
As explained in the previous section discussing whether a Fourth Amendment violation occurred, neither Sokolow nor Kauz nor Taylor clearly establish that entry into the open garage was a Fourth Amendment violation. Sokolow cannot clearly establish the law for the instant case because it is not clear from the facts of Sokolow whether the garage was open and whether there was a passageway from the driveway through the garage to an access door of the home. Kauz cannot clearly establish the law for this case because it is not clear from its facts that the officer could see an interior door from the garage to the home. Thus, neither Sokolow nor Kauz made any holding with respect to an officer entering an open garage to knock on a visible access door to the home. Taylor cannot clearly establish the law for this case because the officers in that case forcibly entered a closed garage. Thus neither Kyllo nor Taylor nor Sokolow nor Kauz clearly establish that entry into this open garage was a Fourth Amendment violation.[15]
Having concluded that no binding case law clearly established the rule of law for this case, we are left with the question of whether the Deputies’ entry of the attached garage was a violation of the Fourth Amendment as a matter of obvious clarity. “[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though *1015 the very action in question has [not] previously been held unlawful.” United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997) (internal quotations omitted). Cases with “fundamentally similar” or “materially similar” facts are not necessary for a finding that the law was clearly established, but preexisting law must provide the officers with fair notice that their conduct is unconstitutional. Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002). To find that a broad principle of law clearly establishes the law as to a specific set of facts, “it must do so ‘with obvious clarity’ to the point that every objectively reasonable government official facing the circumstances would know that the official’s conduct did violate federal law when the official acted.” Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir.2002).
Our case law has made clear that “obvious clarity” cases will be rare. See, e.g., Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir.2002) (referring to obvious clarity cases as a “narrow exception”); Rodriguez v. Farrell, 280 F.3d 1341, 1350 n. 18 (11th Cir.2002) (“We very occasionally encounter the exceptional case in which a defendant officer’s acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable ... officer that what the defendant officer was doing must be ‘unreasonable’ within the meaning of the Fourth Amendment.”). This is because “[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.” Adams v. St. Lucie Cnty. Sheriff’s Dep’t, 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), approved en banc, 998 F.2d 923 (11th Cir.1993) (per curiam). “A reasonable official’s awareness of the existence of an abstract right ... does not equate to knowledge that his conduct infringes the right. Thus, [i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.” Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997) (citation and quotations omitted) (per curiam). ‘We have noted that it would be inappropriate to hold government officials to a higher level of knowledge and understanding of the legal landscape than [that] displayed by judges whose everyday business it is to decipher the meaning of judicial opinions.” Denno v. Sch. Bd. Of Volusia, Cnty., Fla., 218 F.3d 1267, 1274 (11th Cir.2000) (citing Barts v. Joyner, 865 F.2d 1187, 1194 (11th Cir.1989)).
“Obvious clarity” cases, rare in general, will be even more rare in the Fourth Amendment expectation of privacy context because it is inherently fact-specific, thus not lending itself to clearly established law. See United States v. Dunn, 480 U.S. 294, 301, 107 S.Ct. 1134, 1139-40, 94 L.Ed.2d 326 (1987) (setting forth four factors as “useful analytical tools” to determine “whether the area in question is so intimately tied to the home itself that it should be placed under the home’s ‘umbrella’ of Fourth Amendment protection”); O’Connor v. Ortega, 480 U.S. 709, 715, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987) (explaining that because the court “ha[s] no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable” and “[b]ecause the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, is understood to differ according to context” the Court gives weight to various factors in determining the appropriate level of Fourth Amendment protection); Oliver v. United States, 466 U.S. 170, 177, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984) (“No single factor determines whether an individual legitimately may *1016 claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.”); United States v. Smith, 978 F.2d 171, 180 (5th Cir.1992) (“Any determination of the reasonableness of an individual’s expectation of privacy is necessarily fact intensive.”). For a number of reasons, we are unable to conclude that, as a matter of obvious clarity, an open attached garage is either a part of the home, or entitled to the same level of protection as the home.
One indication that this is not a matter of obvious clarity are the decisions from other courts throughout the country concluding that no Fourth Amendment violation occurred in circumstances very similar to those facing the deputies in this case.[16] See, e.g., United States v. Cota-Lopez, 358 F.Supp.2d 579, 590-91 (W.D.Tex.2002) (concluding that officers’ entry into an attached open garage to knock on the service door “was entirely reasonable, and did not violate the Fourth Amendment” because “[i]n entering the open garage, the officers merely took one of two alternative methods of getting to the Residence (the inner garage door or front door)”); Tracht v. Comm’r of Pub. Safety, 592 N.W.2d 863, 865 (MinmApp. 1999) (holding that where officers entered an attached garage through the open garage door for the purpose of knocking on the interior service door “there [was] no basis for distinguishing the officers’ entry into the garage from entering a porch to knock on a door to a house” and that therefore “[t]he officers did not violate the Fourth Amendment by entering the garage and knocking on the service door”); State v. Akins, C4-99-1066, 2000 WL 271986, *1-4, 2000 MinmApp. LEXIS 231, *4-11 (MinmApp. Mar. 14, 2000) (holding that Akins had no reasonable expectation of privacy in his attached open garage because “[p]eople’s expectations for access areas of their premises commonly differ from their expectations for more secluded areas,” and “members of the public would reasonably assume that they could use [the garage for access], when the overhead door was open”); cf. State v. Duhart, 810 So.2d 972, 973 (Fla. 4th DCA 2002) (holding that officer’s entrance into an attached carport — initially referred to in the opinion as a garage — was not a violation of the Fourth Amendment because “[although it is well settled that one has an expectation of privacy in his home or its curtilage, the Fourth Amendment is not necessarily a protection in areas of the home, as in this case, which are open and exposed to public view,” and citing as authority for this proposition State v. Detlefson, 335 So.2d 371 (Fla. 1st DCA 1976), described as holding “no reasonable expectation of privacy on front porch of home where delivery men and others were free to observe plants thereon”). These cases are applications of *1017 the well-established law, mentioned above: “Courts have held that a police with legitimate business may enter areas of the curtilage which are impliedly open to use by the public.” LaFave § 2.3(c) (quotations omitted).
Relatedly, when courts have extended protection to a garage, often great emphasis is given to the fact that the garage was closed. See, e.g., State v. Jenkins, 143 Idaho 918, 155 P.3d 1157, 1160 (2007) (extending Fourth Amendment protection to the garage because it “was part and parcel of the structure constituting his home, and was secured with a door closed at the time police arrived at the home”) (emphasis added); Bies v. State, 76 Wis.2d 457, 251 N.W.2d 461, 464 (1977) (“It is not disputed that the interior of defendant’s garage was within the Fourth Amendment’s protection. The garage was located within the curtilage of his dwelling, and it was not in any sense a semi-public area. The overhead garage door facing on the public alley was shut, reflecting a reasonable expectation of privacy as to the interior of the garage.”) (emphasis added). The open garage door, which both diminishes the Coffins’ reasonable expectation of privacy within the garage and creates a visible passageway to an access door of the home, puts this case in a context where it is affected by a number of competing doctrines: Payton’s absolute protection of the home, the Dunn curtilage factor analysis, and areas impliedly open to public use.
Although we have concluded that, especially in light of Ms. Coffin’s instruction for the officers to leave her property and her attempt to close the garage door, the Deputies’ entry of the garage did in fact violate the Fourth Amendment, we cannot conclude that the law was clearly established such that reasonable officers facing these circumstances would know that their conduct would violate federal law. Several reasons inform our conclusion in this regard. First and foremost is the absence of any binding case law which informs these officers that they were violating the Fourth Amendment. Second, the indications from jurists in non-binding cases that entrance into an attached open garage might not violate the Fourth Amendment, particularly where it appears that the passageway through the garage to a door to the house falls within the doctrine of areas left impliedly open to use by the public. And significantly, Florida cases, of which the Deputies may well have been aware, recognize the doctrine that areas of the curtilage that deliverymen and others use might be impliedly open to the public. See State v. Duhart, 810 So.2d 972, 973. Third, the law with respect to expectation of privacy is a fact sensitive inquiry not lending itself to clearly established law. See Oliver, 466 U.S. at 177, 104 S.Ct. at 1741. Fourth, although these officers had been told once to leave the property, the Florida statute required thab they serve the legal process personally. See discussion in Part II. Finally, the Deputies reasonably believed that Ms. Coffin was resisting service of legal process, a misdemeanor under Florida law, see Fla. Stat. Ann. § 843.02, which occurred in the presence of the officers, thus arguably triggering the Florida statute authorizing the officers to make an immediate arrest. See Fla. Stat. Ann. § 901.15 & (1).
Deputies Lutz and Brandau were thus faced with a very unusual scenario and had only a moment to decide what to do. “The qualified immunity standard ‘gives ample room for mistaken judgments’ by protecting ‘all but the plainly incompetent or those who knowingly violate the law.’ ” Blunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam) (quoting Malley v. Briggs, 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 1097, 1096, 89 L.Ed.2d 271 (1986)). *1018 “This accommodation for reasonable error exists because ‘officials should not err always on the side of caution’ because they fear being sued.” Id. (quoting Davis v. Scherer, 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984)). Standing on the driveway, fully aware that the Coffins knew they were waiting to deliver process and that service of process was being obstructed, the automatic garage door began to close. This occurred while Brandau was seeking advice from a supervisor as to what to do next. The Deputies, by this time, recognized that they likely had probable cause to arrest Ms. Coffin for resisting service of process, and that Florida law gave them the right to immediately arrest. At that point, Brandau was faced with a split-second decision as to whether to enter the garage in order to reach the interi- or door, with all of the issues discussed in this opinion running through her mind but without the benefit of time to analyze them, and without the benefit of binding on-point case law. Although we conclude that the officers did in fact violate the Fourth Amendment under the facts and circumstances of this case, we cannot conclude, in light of all the foregoing considerations, that the officers have violated clearly-established Fourth Amendment law.[17]
For the foregoing reasons, the judgment of the district court is
AFFIRMED.

. For convenience, we sometimes refer to Lutz and Brandau collectively, as “the Depulies."

. The injunction had been issued by the Circuit Court of Charlotte County, pursuant to Fla. Stat. Ann. § 784.046 (West 2011). Section 784.046 allows a petitioner to obtain an "injunction for protection in cases of repeat violence” after "two incidents of violence or stalking [are] committed by the respondent, one of which must have been within 6 months of filing of the petition, which are directed against the petitioner or [an] immediate family member.” Fla. Stat. Ann. § 784.046(l)(b), (2).

. It is undisputed that Lutz did not know that the woman who opened the door was Ms. Coffin at the moment she opened the door but that events following this made her identity clear to him.

. The paperwork to be served contained a description of Mr. Coffin that the man inside appeared to fit.

. To the extent the versions in the preceding two paragraphs differ, the differences are not material.

. The Coffins present only two claims on appeal, and the details of the struggle are not relevant to either claim. It is clear that appellants' only challenges on this appeal are: 1) whether the Deputies’ initial entry into the open garage as the door was shutting violated appellants’ Fourth Amendment rights; and 2) whether the arrest of Ms. Coffin violated her Fourth Amendment rights. Because the Fourth Amendment consequences of the Deputies’ entry into the open garage depend upon Plaintiffs’ expectation of privacy, the facts of the subsequent struggle in the garage and house are not relevant. Similarly the Fourth Amendment consequences of the arrest depend upon probable cause, arguable probable cause, and/or the fruit of any illegal entry into the garage. Again the details of the subsequent struggle are not relevant. Thus, the dissent’s extensive recitation of appellants’ version of the struggle in the garage and in the house is not relevant to the legal issues on appeal. See Barkett, J., concurring in part and dissenting in part, infra at 3-5 (hereinafter "Dissenting Op.”).
If the Deputies here were bad, as the Plaintiffs’ version of the facts of the struggle suggest, those bad, but irrelevant, facts should not lead us to an inaccurate application of precedent.

. Ms. Coffin was charged with the misdemeanor of obstruction of justice without violence under Fla. Stat. Ann. § 843.02. Mr. Coffin was charged with several felonies: two counts of battery on a law enforcement officer under Fla. Stat. Ann. § 784.07(2)(b) and § 784.03(1); resisting an officer with violence under Fla. Stat. Ann. § 843.01; two counts of use of a weapon on a law enforcement officer under Fla. Stat. Ann. § 790.054; and depriving an officer of means of protection or communication under Fla. Stat. Ann. § 843.025. Because the Deputies lacked a warrant for Mr. Coffin's arrest, these charges, with the exception of the § 843.025 charge, were dropped. On March 13, 2007, Mr. Coffin pled no contest to that charge and was sentenced to six days’ confinement. Meanwhile, the § 843.02 charge against Ms. Coffin was dismissed.

. The Coffins do not challenge the arrest of Mr. Coffin, and do not challenge the Deputies' entry into the home itself.

. Fla. Stat. Ann. § 48.03l(l)(a) provides that '‘[s]ervice of original process is made by delivering a copy of it to the person to be served ... or by leaving the copies at his or her usual place of abode with any person residing therein who is 15 years of age or older and informing the person of their contents.” Fla. Stat. Ann. § 48.03l(2)(a) then provides that "[s]ubstitute service may be made on the spouse of the person to be served ..., if the cause of action is not an adversary proceeding between the spouse and the person to be served.”

. Also by contrast, Florida statutes allow for substitute service of other types of documents. See Fla. Stat. Ann. § 48.031 (outlining general guidelines for how to serve process). It is not clear that substitute service is sufficient for proper service of a restraining order in an action by a victim of repeat violence.

. The dissent states that there is no support in the Florida law that a restraining order for repeat violence is treated differently from a standard summons and complaint and cites two decisions of an intermediate court of appeal for the notion that general service-of-process law applies to service of a temporary restraining order. See Dissenting Op. at 1003-04. The cases cited did not involve a restraining order for repeat violence. See Top Dollar Pawn Too, Inc. v. King, 861 So.2d 1264, 1266 (Fla. 4th DCA 2003); Palamara v. World Class Yachts, Inc., 824 So.2d 194, 195 (Fla. 4th DCA 2002) (per curiam). The dissent both overlooks clear language of the Florida procedural rules (indicating that repeat violence petitions must be personally served by a law enforcement officer) and fails to recognize that, as decisions of an intermediate state court, the cases it cites — which incidentally are not on point — could not clearly establish that the general service of process law applies to service of a restraining order against repeat violence in any event.

. The dissent properly points out that the occupants of a house are free to deny an officer’s request to enter their home, and are free to talk to the officers through a closed door. Dissenting Op. at 1004 n.2 (citing Kentucky v. King, 536 U.S. -, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011); United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir.1991) (en banc)). However, the dissent overlooks the fact that the Deputies here did not enter the home; rather, they entered an open garage to access and knock on the visible door to the kitchen.

. Fla. Stat. Ann. § 843.02 provides; “Whoever shall resist, obstruct, or oppose any officer ... personnel or representative of the Department of Law Enforcement; or other person legally authorized to execute process in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree, punishable as provided in 775.082 or 775.083.”

. Contrary to the dissent’s assumption, our opinion does not speculate about Sokolow. We simply point out that nowhere in Sokolow did the Court state whether the garage was open or closed when the officers arrived. Likewise, we note that the Sokolow opinion did not indicate that there was a visible passageway to an access door of the home. The Sokolow opinion is only approximately one page long in its entirety, and its description of the facts is sparse. While it is theoretically possible that such passageway existed, nothing in the opinion suggests that it did. Accordingly, it is clear that Sokolow makes no holding with respect to an officer entering an open garage with a passageway to knock on a visible access door to the home. Thus, Sokolow cannot control this case.

. The dissent seems to place particular reliance upon Payton and its language, “the unambiguous physical dimensions of an individual's home.” Payton v. New York, 445 U.S. 573, 589, 100 S.Ct. 1371, 1381-82, 63 L.Ed.2d 639 (1980). However, despite the dissent's repeated insistence, Payton simply did not involve a garage at all. Thus, Payton cannot clearly establish whether an open attached garage is part and parcel of the home.

. Only cases from the Supreme Court of the United States, the Eleventh Circuit, or the Florida Supreme Court can clearly establish the law in our Circuit, but opinions from other courts can suggest that reasonable jurists would not know that certain factual situations rise to the level of constitutional violations, and therefore reasonable officers would not either. Denno v. Sch. Bd. of Volusia, Cnty., Fla., 218 F.3d 1267, 1272-76 (11th Cir.2000) (considering a number of non-binding opinions because "[i]n [the Court’s] attempt to identify the legal landscape that would have been apparent to such a reasonable school official, it is instructive to take note of the perspective of several reasonable jurists who have attempted to articulate the [relevant] legal landscape”).
Contrary to the dissent’s rebuke, our consideration of these non-binding cases does not assume or require that officers will sift through the law of every jurisdiction. Rather, as we noted in Denno, the development of the law in other jurisdictions merely reflects the legal landscape, how reasonable jurists have interpreted relevant precedent, and, thus, how reasonable officers might.

. The strong language in the dissent suggests a firmly held belief that qualified immunity should not apply in this case. The dissent apparently believes either: 1) that Payton, Kyllo, Sokolow, or Kauz actually holds that an open attached garage is part and parcel of the home; or 2) that it is obvious as a matter of common sense that an open attached garage is just like “a living room, a den, or a bedroom.” With respect to the former, we believe we have demonstrated at the very least that neither Payton nor Kyllo nor Sokolow nor Kauz clearly establishes that an open attached garage with a passageway to a visible door to the kitchen is part and parcel of the home. With respect to the latter, we simply disagree; we believe that deliverymen not infrequently use a passageway through an open garage to access a visible kitchen door in circumstances similar to the situation here. We do not believe this garage was just like a living room, a den, or a bedroom.