[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13245

Non-Argument Calendar

_____

CONSTANCE JILES,

Plaintiff-Appellee,

*versus*

ANGIE REBECCA LOWERY,
individually and in her official capacity as
an employee of the Whitfield
County Sheriff's Office,
BRANDON FINCHER,
individually and in his official capacity as
an employee of Whitfield
County Sheriff's Office,

2                          Opinion of the Court                    22-13245

Defendants-Appellants,

SCOTT CHITWOOD, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 4:20-cv-00162-MHC

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN and BRANCH, Circuit Judges.

PER CURIAM:

Lieutenant Angie Rebecca Lowery and Deputy Brandon Fincher appeal the denial of qualified immunity. Constance Jiles complained that Lowery unlawfully entered the garage attached to her home, without her consent or exigent circumstances, and arrested her without a warrant, and Fincher failed to intervene to stop the unlawful arrest. The officers moved for summary judgment based, in part, on qualified immunity. The district court denied their motion for qualified immunity. We affirm.

## I. BACKGROUND

We view the evidence in the light most favorable to Jiles as the nonmoving party. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). On July 15, 2018, Jiles was upstairs at her home while her six-year-old and eight-year-old daughters played outside the garage. Jiles's daughters ran upstairs to her, screaming that two unknown men were in the garage. The garage was at the bottom of a steep driveway and had two doors that raised and lowered vertically, as well as an interior door to the home. Thirteen people, including Jiles, were in the home. Jiles entered the garage and confronted the "rough looking" men, who told Jiles that they "didn't have to talk to [Jiles]" and "had a right to be there." The men were later identified as Christopher Moore and Jason Goss, who were sent there to repossess Jiles's husband's Harley-Davidson motorcycle.

The confrontation escalated quickly. Several of Jiles's family members joined her in yelling at the men. Jiles told the men that if they "didn't get the hell out," she was going to get a gun and "blow their heads off." Jiles did not have a gun in the house but wanted to scare the men off. Moore stepped back toward the garage entrance, but Goss "thought that this was a laughing matter" and walked further into the garage. Goss knocked over a space heater, which resulted in glass being broken and Jiles's eight-year-old daughter cutting her toe. Jiles became "really pissed [] off" that Goss had injured her daughter. As Goss was leaving the garage, Jiles took the palm of her hand and "pushed him out." Goss told

Jiles that she was going to jail for assault and called the police. Meanwhile, one of Jiles's daughters called the police and handed the phone to Jiles, and Jiles's husband drove off on the motorcycle.

Dispatch called Lowery and Fincher to the residence about a subject in the garage and a "lady making threats to shoot somebody." The written dispatch notes to Lowery and Fincher advised that Jiles said that she did not have a firearm. Dispatch also relayed Lowery's instructions to the men to leave the scene for their safety, but the men told dispatch that they would not leave, which suggested to Lowery that the men were not "too scared." When Lowery and Fincher pulled up to the residence, the men were sitting in their truck on the roadway in front of the house. The men admitted to being in Jiles's garage to verify the vehicle identification number on the motorcycle, and Goss said that Jiles had hit him in the back. At that time, Lowery did not know if the men had a right to enter the garage, but she knew that she did not have probable cause to arrest Jiles.

After speaking with the men, Lowery walked down the driveway toward Jiles, who was sitting in the garage, and yelled, "What's the problem?" Fincher followed Lowery to the garage. Jiles's son-in-law began recording on his phone and told Jiles that Lowery, who had responded to a prior disturbance at the house, was "very rude and unprofessional and comes across as a . . . b**ch." Because Lowery's "type of demeanor . . . rubbed [Jiles] totally the wrong way," Jiles told Lowery to change her tone. Lowery insisted that she had a right to be there and to ask Jiles

questions. Jiles responded that "respect goes both ways" and that Lowery could "get somebody else out" to talk to her, but Jiles maintained that she was not going to talk to Lowery until Lowery changed her demeanor.

Jiles then pressed a button that closed the left-side garage door, as viewed from the front of the house, "in [Lowery's] face." As Jiles was in the process of closing the right-side garage door, Lowery walked in through that door yelling continuously "You're going to talk to me, lady." It is unclear exactly where the second garage door was in the closing process when Lowery walked through it, but Lowery "felt as though it was coming down on [her]" and that the door "was closing in the process of [Lowery] going under it." After walking inside, Lowery grabbed Jiles's arm and took her outside the garage, put her on the ground using a leg-sweep maneuver, and landed on top of her. Fincher tried to get Jiles's hands but stopped to draw his taser and tell Jiles's family members to get back.

According to Lowery, she believed that she could enter Jiles's home without a warrant because it was a "hot pursuit" for the alleged crime of assault and battery, although Lowery did not believe that Jiles tried to flee. Lowery did not tell Jiles that she was under arrest for obstruction for refusing to cooperate with the investigation until they were outside the garage because Lowery did not want Jiles to close the other garage door and run inside the house. After Lowery handcuffed Jiles, Fincher and Lowery walked

Jiles backwards up the driveway and placed Jiles in the patrol car. Moore was charged with criminal trespass.

Jiles sued Lowery and Fincher and alleged that their conduct violated the Fourth Amendment. 42 U.S.C. § 1983. The officers moved for summary judgment based, in part, on qualified immunity.

The district court denied the motion for summary judgment based on qualified immunity. The district court ruled that it was undisputed that Lowery and Fincher were engaged in a discretionary function. But, as to Lowery, it ruled that the evidence did not support her contention that Jiles consented or that there were exigent circumstances to justify Lowery's entry into the garage. And the district court agreed with Jiles that Lowery's actions violated the Fourth Amendment as clearly established by *Coffin v. Brandau*, 642 F.3d 999 (11th Cir. 2011) (en banc).

The district court also ruled that Fincher was not entitled to qualified immunity. The district court stated that "[b]ecause Fincher was engaged in a discretionary function, the burden shift[ed] to Jiles to show that qualified immunity d[id] not apply." The district court found that there was a disputed issue of material fact about whether Fincher was in a position to intervene because he had turned away to deal with Jiles's family members. But the district court viewed the evidence in the light most favorable to Jiles and ruled that, if Fincher was in a position to intervene to stop the arrest, he violated clearly established federal law by not doing so.

## II. STANDARD OF REVIEW

"We review *de novo* whether . . . [law enforcement] officers are entitled to immunity." *Black v. Wigington*, 811 F.3d 1259, 1265 (11th Cir. 2016). We resolve any issues of material fact in Jiles's favor and then address the legal question of whether the officers are entitled to qualified immunity using that version of the facts. *See Penley v. Eslinger*, 605 F.3d 843, 848-49 (11th Cir. 2010).

## III. DISCUSSION

Qualified immunity shields officials who are acting within their discretionary authority from liability when their conduct does not violate a federal statutory or constitutional right that was clearly established at the time of the challenged action. *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020). If the official is acting within the scope of her discretionary authority when she commits the allegedly unlawful actions, the plaintiff must prove "that qualified immunity is not appropriate." *Penley*, 605 F.3d at 849 (quoting *Ferraro*, 284 F.3d at 1194). "We are required to grant qualified immunity to a defendant official unless the plaintiff can demonstrate two things: (1) that the facts, when construed in the plaintiff's favor, show that the official committed a constitutional violation and, if so, (2) that the law, at the time of the official's act, clearly established the unconstitutionality of that conduct." *Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015). Because Jiles does not dispute that Lowery and Fincher were acting within their discretionary authority, this appeal turns on whether Jiles met her

burden of establishing that the officers are not entitled to qualified immunity. *See id.* We conclude that she did.

### A. Lowery's Argument for Qualified Immunity Fails.

Lowery concedes that a warrantless arrest in a suspect's garage generally is unlawful but argues that the district court erred in ruling that the arrest was unlawful based on clearly established law. Lowery argues that, unlike the deputies in *Coffin*, she had an objectively reasonable, though mistaken, good faith belief that she had at least implied, if not express, consent to enter the garage because of Jiles's call to 911. Alternatively, Lowery argues that exigent circumstances were present. We disagree.

Under the Fourth Amendment, seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). The existence of probable cause alone does not validate a warrantless home arrest. *Bashir v. Rockdale County*, 445 F.3d 1323, 1328 (11th Cir. 2006). Instead, "a warrantless arrest in a home violates the Fourth Amendment unless the arresting officer had probable cause to make the arrest *and* either consent to enter or exigent circumstances demanding that the officer enter the home without a warrant." *Id.* It is the officials' burden to prove that their presence in the home was justified by exigent circumstances or consent. *Id.*

No reasonable officer would believe they had Jiles's voluntary consent to enter. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Jiles closed one of the garage doors in Lowery's face and

was in the process of closing the second garage door when Lowery entered the garage anyway. And Jiles already had told Lowery that she would not talk to Lowery. Although we have held that consent can be implied under some circumstances, such as where a defendant has yielded the right-of-way in response to an officer's request for admission to the home, no reasonable officer would construe Jiles's words and actions as implying consent to enter the garage. *See, e.g., United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002). Indeed, Lowery's admission that she entered the garage because she was afraid that Jiles would successfully close the garage doors contradicts her position that she believed Jiles consented to the entry. Put simply, stating that one will not answer an officer's questions, closing a door in the officer's face, and attempting to close a second door in front of the officer adequately communicates that the officer does not have consent to enter.

No reasonable officer would believe that the circumstances were exigent. The exception for exigent circumstances exists for situations where "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007). Exigent circumstances that have justified warrantless entries into the home have included preventing the destruction of evidence, breaking up a violent fight, putting out a fire, and pursuing a fleeing suspect. *See id.* at 1240-41.

Exigent circumstances did not exist here. The record does not support Lowery's argument that the scene was "chaotic" when

the officers arrived. Instead, when Lowery and Fincher arrived, the men were sitting in their truck, and Lowery could not even see Jiles from the roadway. So there was no ongoing fight between the parties that required Lowery's intrusion into the garage. Although Lowery insists that Jiles's threats to shoot the men presented an exigent circumstance, Lowery testified that she believed her reason for entering the garage was her concern that Jiles, who had already shut one garage door, would shut the other garage door. And the record lacks any support for Lowery's argument that rendering medical aid to Jiles's daughter was behind her decision to enter the garage and grab Jiles. No reasonable officer would believe that the circumstances were sufficiently exigent to justify a warrantless entry into the Jiles's garage, and Lowery was not permitted to make a warrantless arrest.

Because Jiles met her burden of establishing a Fourth Amendment violation, we must consider whether it was clearly established that Lowery's conduct was unconstitutional. *See Singletary*, 804 F.3d at 1180. Qualified immunity may only be denied when the officers have "fair and clear warning of what the Constitution requires," such that a reasonable officer would understand that her conduct violates a constitutional right. *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 617 (2015). The unlawfulness of the conduct must be apparent from the pre-existing law but does not require "[e]xact factual identity with a previously decided case." *Coffin*, 642 F.3d at 1013. This "fair warning" inquiry "must

be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*

The unlawfulness of Lowery's conduct was established in *Coffin*. The crucial question in *Coffin* was whether the law was clearly established that Fourth Amendment protection extended to an open and attached garage for qualified-immunity purposes. *Id.* at 1010. The deputies in *Coffin* entered the Coffins' attached garage after Ms. Coffin told the deputies to leave and while she attempted to close the garage door. *Id.* at 1012-13. Although we declined to hold that entering an open garage to gain access to an interior door to the home was a Fourth Amendment violation in every case, we held that the deputies violated the Fourth Amendment by entering the garage despite Ms. Coffins's attempt to close the garage door to maintain privacy and verbal communication that the deputies were not welcome to enter. *Id.* Nevertheless, we affirmed the grant of qualified immunity to the deputies in *Coffin* because it was not clearly established at the time that their actions violated the Fourth Amendment. *Id.* at 1018.

The same cannot be said now. Lowery's entry into Jiles's garage, after she had closed one garage door in Lowery's face and was attempting to close another, and while maintaining that she would not talk to Lowery, is "fundamentally similar" to the deputies' unconstitutional conduct in entering the open, attached garage in *Coffin*. *Id.* at 1015. Because the unlawfulness of Lowery's conduct was clearly established at the time of Jiles's arrest, the district court did not err in denying qualified immunity to Lowery.

*Singletary*, 804 F.3d at 1180. Because "each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions," we next consider whether Fincher was entitled to qualified immunity based on "only the actions and omissions in which [he] engaged." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018).

### B. Fincher's Argument for Qualified Immunity Fails.

Fincher argues that Jiles failed to present caselaw that clearly established that Fincher had a duty to intervene to stop her unlawful arrest. "[A]n officer can be liable for failing to intervene when another officer uses excessive force" if he "is in a position to intervene and fails to do so." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000). Because damages for false arrest include damages for use of force to effect that false arrest, a claim that force applied during a false arrest is excessive is subsumed in the false arrest claim. *See Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000); *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995).

The record reveals a genuine factual dispute about whether Fincher was in a position to intervene to stop Lowery's arrest of Jiles. Under Fincher's version of events, his involvement in the arrest was limited to his attempt to keep Jiles's family away from himself and Lowery during her arrest of Jiles. But Lowery reported that, when she first grabbed Jiles's arm, Fincher assisted by grabbing Jiles's other arm to put handcuffs on Jiles. Viewed in the light most favorable to Jiles, there is substantial evidence that Fincher was in a position to intervene. Because a reasonable jury could find

that Fincher was in a position to intervene to stop Lowery from unlawfully arresting Jiles, as was his duty under clearly established law, *see Priester*, 208 F.3d at 924, the district court did not err in denying qualified immunity to Fincher. And although Fincher argues that the district court erred by placing the burden on him to prove entitlement to qualified immunity, we disagree. The district court specified that the "burden shift[ed] to Jiles to show that qualified immunity d[id] not apply," and we are satisfied that the district court correctly found that Jiles met her burden.

## IV. CONCLUSION

We **AFFIRM** the partial denial of summary judgment based on qualified immunity to Lieutenant Lowery and Deputy Fincher.