[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13059
_____

D.C. Docket No. 1:16-cv-23925-CMA

FIOR PICHARDO DE VELOZ,
CESAR CRISTOBAL VELOZ TIBURICO,

Plaintiffs-Appellants,

versus

MIAMI-DADE COUNTY,
MIAMI-DADE CORRECTIONS AND REHABILITATION DEPARTMENT,
FATU KAMARA-HARRIS,
Nurse,
THE PUBLIC HEALTH TRUST OF MIAMI-DADE COUNTY, FLORIDA,
d.b.a. Jackson Health System,
TRAVARRI JOHNSON,
Corporal, et al.,

Defendants-Appellees,

BOBBY MARSHALL,
Nurse, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 21, 2018)

Before ED CARNES, Chief Judge, and ROSENBAUM and HULL, Circuit Judges.

HULL, Circuit Judge:

Plaintiff Fior Pichardo De Veloz brought this lawsuit against defendants Nurse Fatu Kamara Harris and Dr. Fredesvindo Rodriguez-Garcia who work in the medical unit at the Turner Guilford Knight Correctional Center (the "TGK jail"). In her second amended complaint, Mrs. Pichardo seeks damages for injuries that she sustained during her time in pre-trial custody. After a strip search at booking, Mrs. Pichardo was determined to be a biological female and booked into the TGK jail as a female. Nonetheless, about six hours later, defendants in the medical unit sent Mrs. Pichardo to a male prison without physically examining her, without investigation, and indeed in the face of considerable information that she was a woman. The district court granted the defendants' motion to dismiss the second amended complaint.

This appeal involves only Mrs. Pichardo's 42 U.S.C. § 1983 deliberate indifference claims against defendants Nurse Harris and Dr. Rodriguez-Garcia. Mrs. Pichardo alleges her constitutional rights were violated by Nurse Harris's and

2

Dr. Rodriguez-Garcia's knowledge of and deliberate indifference to the substantial risk of serious harm she faced by their wrongfully classifying her as a male inmate. After careful review, and with the benefit of oral argument, we reverse the district court's order as to Mrs. Pichardo's § 1983 claims against Nurse Harris and Dr. Rodriguez-Garcia and remand for further proceedings.

## I.  FACTUAL BACKGROUND

Because the defendants moved to dismiss the second amended complaint under Federal Rule of Civil Procedure 12(b)(6), we accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff Mrs. Pichardo.  See Mills v. Foremost Ins. Co., 511 F.3d 1300, 1303 (11th Cir. 2008). Also, because Mrs. Pichardo's second amended complaint incorporates by reference the Miami-Dade County Internal Investigation report into this incident, as well several witness statements, we may properly consider those documents on appeal.  See Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6)

dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment.").[1]

## A. Arrest and Booking as a Female

On November 4, 2013, Mrs. Pichardo—who is a wife, mother, grandmother, prominent lawyer, and elected official in her home city in the Dominican Republic—flew to Miami to be with her daughter, who was expecting a child. At that time, Mrs. Pichardo was 50 years old and undergoing hormone replacement therapy as prescribed by a doctor to address symptoms of menopause. She also suffered from high blood pressure.

Upon arrival at the Miami International Airport, at approximately 5:30 p.m., Mrs. Pichardo was arrested on an outstanding warrant. The arrest affidavit listed Mrs. Pichardo's gender as female.

Around 6:30 p.m., Mrs. Pichardo was booked into the TGK jail, which is operated by the Miami-Dade County Corrections and Rehabilitation Department. At booking, Mrs. Pichardo's gender was entered as female and she was processed through intake as female. More specifically, at 7:17 p.m., a female officer strip searched Mrs. Pichardo, during which she had to "lift her arms, turn around, bend over at the waist, grab her butt cheeks, spread, [and] cough." The female officer

---

[1]The defendants, who also relied on these documents at length, attached them to their motion to dismiss and do not object to our consideration of them on appeal.

was required to "look at [Mrs. Pichardo's] entire body and make sure there's nothing inserted up the reproductive area, nothing taped to the body, nothing hidden."

Correctional officers conducting this initial strip search are responsible for determining an inmate's gender. If during a strip search, an officer discovers the inmate is of the opposite gender than he or she appears to be, the search is discontinued and a supervisor and officer of the inmate's gender is summoned to continue with the strip search. And if a doubt exists regarding the inmate's gender, medical staff are summoned and present during the strip search as well. According to the female officer who conducted Mrs. Pichardo's strip search, she "did not notice anything abnormal" and gave Mrs. Pichardo the orange uniform that female inmates wear. Thus, through the strip search, Mrs. Pichardo was correctly classified as a female.

## B. Defendants Reclassify Mrs. Pichardo as Male

At approximately 12:00 a.m. on November 5, due to Mrs. Pichardo's history of high blood pressure, Officer Kimberly Jones escorted her to the medical unit for evaluation. Mrs. Pichardo arrived in the medical unit handcuffed along with other female inmates. She was not there for the medical staff to make a gender determination. At that time, Officer Audrey Morman, defendant Nurse Harris, and defendant Dr. Rodriguez-Garcia were working in the medical unit of the TGK jail.

5

Officer Morman placed Mrs. Pichardo and the other female inmates in a cell to wait for the doctor to see them.  Dr. Rodriguez-Garcia was the attending physician on duty.  Both he and Nurse Harris are licensed medical professionals with many years of experience and were aware that women in their fifties are likely to be undergoing menopause and that women undergoing menopause are commonly given some form of hormone replacement therapy.

While Mrs. Pichardo was waiting, Nurse Harris approached Officer Morman and asked her if Mrs. Pichardo was a male.  Although Nurse Harris had not yet seen or interacted with Mrs. Pichardo, she told Officer Morman that she thought that Mrs. Pichardo might be male based on a note in her medical file indicating that she was undergoing hormone replacement therapy.  Nurse Harris told Officer Morman that male inmates take hormone pills to enhance their breasts; however, Nurse Harris later acknowledged knowing that menopausal women take hormone replacement pills too.

In response, Officer Morman told Nurse Harris that Mrs. Pichardo had been booked and classified as female.  But Nurse Harris insisted that Mrs. Pichardo might not be female because she took hormone pills.  Officer Morman told Nurse Harris that she still believed Mrs. Pichardo was female because she looked like a woman and her file had "the blue tab," which said female and was circled in red.  Nevertheless, Nurse Harris said she was going to examine Mrs. Pichardo.

6

Officer Morman and Nurse Harris then walked over to the holding cell and Nurse Harris asked Mrs. Pichardo if she was female. Mrs. Pichardo told Nurse Harris that she was a woman and did not understand why her gender was being questioned. Nurse Harris also asked Mrs. Pichardo if she had "female parts." Once again, Mrs. Pichardo answered that she did and did not understand why she was being asked those questions.

At approximately 2:00 a.m., Nurse Harris escorted Mrs. Pichardo to the examination room but was not present during Dr. Rodriguez-Garcia's assessment of Mrs. Pichardo. Dr. Rodriguez-Garcia evaluated Mrs. Pichardo, "which consisted of medical history questions in Spanish, a visual check of the eyes, mouth and skin for sores and [listening] to the lungs with a stethoscope." Dr. Rodriguez-Garcia did not physically examine Mrs. Pichardo undressed and in fact he did not ask her to remove her clothes.

Dr. Rodriguez-Garcia said that, when he began the examination, he had reviewed Mrs. Pichardo's medical pre-screening documentation, which stated that she was undergoing hormone replacement therapy. Mrs. Pichardo's medical pre-screening assessment form, dated November 4, 2013, at 6:44 p.m. indicated that she took hormone replacement pills, but also said "Menopause Medical" under the comments. Despite being aware that menopausal women commonly take this type of medication, Dr. Rodriguez-Garcia assumed that she was a man undergoing

7

gender reassignment. "[H]e did not know why but when he learned that Inmate Pichardo was on [hormone replacement therapy], he assumed that she was transgender."

Dr. Rodriguez-Garcia "explained that based on the [hormone replacement therapy] and the assumption that she (Pichardo) was transgender; he asked her in a general sense if she had all [of her] 'sex parts,' [by] which he meant genitals." He also "asked Inmate Pichardo if she had any surgery to her genitals." Mrs. Pichardo replied that she did have all of her genitals and had not had any surgery on her genitals.

At no point did Dr. Rodriguez-Garcia ask Mrs. Pichardo if she was a woman, a man, or transgender. While he vaguely asked about her "sex parts," he did not ask her if she had male or female genitalia. He also did not ask her why she was on hormone replacement therapy because "it was a difficult question to ask."

Dr. Rodriguez-Garcia decided to reclassify Mrs. Pichardo as male because she was on hormone replacement therapy. He wrote on her medical chart that she was a "male on hormonal treatment transgender" and indicated that she "could go to the general [male] population." He did so without ever physically examining Mrs. Pichardo or asking Nurse Harris to physically examine her.

8

Dr. Rodriguez-Garcia explained that in cases where a visual check of the genitals is required, the patient is taken to the clinic where a doctor, nurse, and officer are present to perform the check.  He acknowledged that he has conducted such visual checks to verify an individual's gender before, but did not perform such a visual check to verify Mrs. Pichardo's gender.  Instead, he made a note in her medical record that an assessment of her genital-urinary system was "deferred"—meaning that an assessment would be conducted at a later time.  Dr. Rodriguez-Garcia knew that by classifying Mrs. Pichardo as a male, she would be placed in an all-male detention facility.

Five minutes after Nurse Harris took Mrs. Pichardo to the examination room, Nurse Harris came back and told Officer Morman that "everything fell out," by which she meant Mrs. Pichardo's "penis [and] testicles."  Nurse Harris, however, was not present during Dr. Rodriguez-Garcia's medical evaluation of Mrs. Pichardo and had no basis for this statement.  Nurse Harris also later admitted that Dr. Rodriguez-Garcia did not tell her about his conversation with Mrs. Pichardo.

Once again, Officer Morman told Nurse Harris that she believed Mrs. Pichardo looked like a female, but Nurse Harris insisted that Mrs. Pichardo was a man.  Officer Morman reviewed Mrs. Pichardo's booking record and reminded Nurse Harris that Mrs. Pichardo was strip searched when she arrived at the facility.

9

Officer Morman later explained that if Mrs. Pichardo had a penis and testicles, the officer who strip searched her during booking would have seen them.  That is why Officer Morman did not believe that Mrs. Pichardo was a man because it would have been discovered during initial booking.

Officer Morman called her supervisor, Sergeant Regina Price, to explain the situation.  According to Officer Morman, Sergeant Price also did not believe that Mrs. Pichardo was male.  However, because Dr. Rodriguez-Garcia had seen Mrs. Pichardo and because Nurse Harris had said she was a man, Sergeant Price sent Officer Jones back to the medical unit to escort Mrs. Pichardo to an all-male cell. Sergeant Price also asked Officer Morman to get an addendum from Nurse Harris confirming that Mrs. Pichardo was male, which the officer did.  Nurse Harris gave Officer Morman a health services incident addendum that identified Mrs. Pichardo as: "Transgender, male parts, female tendencies."

Officer Kimberly Jones then returned to the medical unit to bring Mrs. Pichardo back to her cell.  When Officer Jones arrived, she learned that Doctor Rodriguez-Garcia and Nurse Harris had determined that Mrs. Pichardo was a man. Officer Jones then asked Nurse Harris three times if she had strip searched or physically examined Mrs. Pichardo before claiming that she was a man.  Nurse Harris did not verbally confirm that she physically examined Mrs. Pichardo or even answer Officer Jones's questions.  Instead, Nurse Harris simply replied "she's

10

a man" and walked away.  Even though Nurse Harris insisted that Mrs. Pichardo was a man, Officer Jones believed that Mrs. Pichardo was a woman.

At about 2:15 a.m., Officer Jones escorted Mrs. Pichardo from the medical unit and had her sit by herself outside the shift commander's office.  Officer Jones did so because she felt that Mrs. Pichardo was female and she wanted to speak to her supervisor, Sergeant Price.  Officer Jones was concerned because Mrs. Pichardo appeared to be female and "nothing about her said male."

Based on Dr. Rodriguez-Garcia's assessment, Sergeant Price directed Officer Jones to contact booking and advise them to change Mrs. Pichardo's sex from female to male.  Officer Jones followed Sergeant Price's instructions and, at 2:20 a.m., the booking department changed Mrs. Pichardo's sex classification to male.  As a result, Mrs. Pichardo was transferred to Metro West, a male correctional facility, where she was treated as a man and placed with the general male population.

## C. Transfer to a Male Facility

At about 12:43 p.m. on November 5, Mrs. Pichardo arrived at the Metro West jail.  A female officer escorted her to one of the cells in Three Alpha Wing, a transit unit for new arrivals.  Mrs. Pichardo told the officer that she was a woman.  The officer recognized that Mrs. Pichardo was female and replied: "you are a woman.  Good luck if you are alive tomorrow."

When Mrs. Pichardo was placed in Three Alpha Wing, she was terrified. She was surrounded by approximately 40 men and feared for her life. The male inmates harassed her. Mrs. Pichardo was too afraid to use the restroom that was being used by the male inmates and urinated on herself instead. Mrs. Pichardo later told an investigator she felt "psychologically assaulted because everyone looked at her as if she was a piñata." The male inmates gathered in small groups, called out to her, "Mami, Mami," and laughed. At some point, Mrs. Pichardo asked a female officer to please move her because "she was going to go crazy."

An officer in Three Alpha Wing said that Mrs. Pichardo was assigned to Bunk 2 "because whenever there is someone that looks female, we always put [th]em to the front so that the officer can watch them" for protection. The officer also explained that Mrs. Pichardo looked scared to get off of her bunk and did not want to interact with the other inmates.

While she was in that cell, Mrs. Pichardo met an elderly man and told him that she was a woman. The older man informed corrections officers that Mrs. Pichardo was female but the officers did nothing.

**D. Metro West Staff Reclassifies Mrs. Pichardo as Female**

Meanwhile, Mrs. Pichardo's family members were trying to contact her. They had not heard from Mrs. Pichardo after her arrest, so they drove to the TGK jail. An officer there told the family members that Mrs. Pichardo was housed at

12

the Metro West jail, which they later learned was a male detention facility.  Mrs. Pichardo's family informed the TGK jail staff that Mrs. Pichardo was a woman and asked why she was housed in the male detention facility.  As a result of their prodding, the staff initiated an investigation to determine Mrs. Pichardo's gender.

At approximately 7:30 p.m. on November 5, Mrs. Pichardo was strip searched again, this time by a female nurse at the Metro West jail.  Several male corrections officers were present during the strip search and laughed at her.  Mrs. Pichardo also remembered that someone took pictures of her while she was undressed.  The female nurse who conducted this second strip search said that her initial impression was that Mrs. Pichardo was female and the strip search verified Mrs. Pichardo's biological sex to be female.  The nurse also learned that Mrs. Pichardo was a mother of three children and was taking hormone pills for menopausal treatment.  According to the nurse, Mrs. Pichardo did not appear to be transgender.  Mrs. Pichardo was then separated from the general male population.

### E. Transfer Back to the Female Facility and Release

At around 9:00 p.m. on November 5, Mrs. Pichardo was transferred back to the TGK jail and housed in an all-female unit.  The next day, the TGK jail released Mrs. Pichardo into the custody of the United States Marshal Service.  As a result of the defendants' actions, Mrs. Pichardo alleged that she suffered from medically

13

diagnosed post-traumatic stress disorder, marital instability, ridicule of her family, humiliation, and professional decline.

## II.  PROCEDURAL HISTORY

In her second amended complaint, Mrs. Pichardo raised 15 claims under both federal and state law against multiple defendants, all of whom moved to dismiss the claims.[2]  Relevant to this appeal, Mrs. Pichardo alleged two claims against Nurse Harris and Dr. Rodriguez-Garcia under § 1983 and the Fifth and Fourteenth Amendments for deliberate indifference to a substantial risk of serious harm to her health and safety.

The defendants moved to dismiss the complaint for failure to state a claim, arguing that they did not violate Mrs. Pichardo's clearly established constitutional rights and were entitled to qualified immunity.  Ultimately, the district court dismissed all of the federal claims against all defendants[3] and declined to exercise supplemental jurisdiction over the state law claims.  As to the deliberate indifference claims, the district court determined that Mrs. Pichardo did not state a cause of action because Nurse Harris and Dr. Rodriguez-Garcia did not have "the

---

[2]Although Mrs. Pichardo's husband, Cesar Cristobal Veloz Tiburcio, brought a state law claim for loss of consortium against the defendants and his name is on the notice of appeal, the briefs on appeal do not address his claim.  At oral argument, Mrs. Pichardo's counsel explained that Mr. Veloz does not challenge on appeal the district court's dismissal of his loss of consortium claim.

[3]Plaintiff Mrs. Pichardo sued more than ten other defendants, but Nurse Harris and Dr. Rodriguez-Garcia are the only defendants in this appeal.

14

subjective knowledge required to state claims of deliberate indifference." Because Mrs. Pichardo did not show Nurse Harris and Dr. Rodriguez-Garcia violated a constitutional right, the district court concluded that both were entitled to qualified immunity.

Mrs. Pichardo timely appealed.

### III.  STANDARD OF REVIEW

The district court's Rule 12(b)(6) dismissal is subject to plenary review. Lane v. Philbin, 835 F.3d 1302, 1305 (11th Cir. 2016). To survive a motion to dismiss, the complaint must have set out facts sufficient to "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007). This means Mrs. Pichardo must have alleged "factual content that allow[ed] the court to draw the reasonable inference that the defendant[s] [were] liable for the misconduct." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). "The allegations must be plausible, but plausibility is not probability." Lane, 835 F.3d at 1305.

### IV.  DISCUSSION

#### A. Qualified Immunity

Nurse Harris and Dr. Rodriguez-Garcia maintain that they are entitled to the protections of qualified immunity. To receive qualified immunity, a public official must first prove that he was acting within the scope of his discretionary authority

15

when the allegedly wrongful acts occurred.  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).  Mrs. Pichardo does not dispute that Nurse Harris and Dr. Rodriguez-Garcia were acting "within the scope of [their] discretionary authority," so she bears the burden of showing that the defendants are not entitled to qualified immunity.  Perez v. Suszczynski, 809 F.3d 1213, 1218 (11th Cir. 2016).

To meet this burden, Mrs. Pichardo must establish both that: "(1) the defendants violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."  Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (internal quotations omitted).  We address these issues in turn below.

## B. Violation of a Constitutional Right

We first consider whether, taken in the light most favorable to Mrs. Pichardo, the facts alleged in the second amended complaint show that Nurse Harris's and Dr. Rodriguez-Garcia's conduct violated a constitutional right.  As a pretrial detainee, Mrs. Pichardo's rights "exist under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment."  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306 (11th Cir. 2009).  Nonetheless, "the standards under the

16

Fourteenth Amendment are identical to those under the Eighth." Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007).[4]

The Eighth Amendment "imposes [a] dut[y] on [prison] officials" to "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (internal quotations omitted). In particular, under the Eighth Amendment, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. Id. at 833, 114 S. Ct. at 1976. "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834, 114 S. Ct. at 1977.

A prison official violates the Eighth Amendment "only when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." Bowen v. Warden Baldwin State Prison, 826 F.3d 1312, 1320 (11th Cir. 2016) (internal quotations omitted). To state an Eighth Amendment claim of deliberate indifference, a plaintiff must allege facts sufficient to show (1) that she was subjected to a "substantial risk of serious harm," (2) the defendants' deliberate indifference to that risk, and (3) causation.

---

[4]Because all parties refer to Mrs. Pichardo's claims as Eighth Amendment claims, we do too for purposes of this opinion.

17

Purcell ex rel. Estate of Morgan v. Toombs Cty., 400 F.3d 1313, 1319 (11th Cir.

2005).

The first element—a substantial risk of serious harm—is assessed under an

objective standard. Caldwell, 748 F.3d at 1099. Because Mrs. Pichardo's alleged

risk of serious harm has to do with the jail's environment, her case falls into the

"conditions of confinement" category of deliberate-indifference cases as opposed

to the medical treatment category. See generally Rhodes v. Chapman, 452 U.S.

337, 101 S. Ct. 2392 (1981) (conditions of confinement); Estelle v. Gamble, 429

U.S. 97, 97 S. Ct. 285 (1976) (medical treatment). In this context, Mrs. Pichardo

must allege that the confinement condition she complains of was sufficiently

serious to violate the Eighth Amendment. See Chandler v. Crosby, 379 F.3d 1278,

1289 (11th Cir. 2004). We have explained that "[w]hile an inmate need not await a

tragic event before seeking relief, [s]he must at the very least show that a condition

of [her] confinement pose[d] an unreasonable risk of serious damage to h[er] future

health or safety." Id. (internal quotations and citations omitted).

In this particular case, no party disputes that placing a female in the general

population of a male detention facility created an extreme condition and posed an

unreasonable risk of serious harm to the female's future health or safety. Nor

should they dispute this. It is abundantly clear to us that housing a biological

female alongside 40 male inmates poses an outrageous risk that she will be

harassed, assaulted, raped, or even murdered.  See Purcell, 400 F.3d at 1320 (explaining that a prisoner has a right, secured by the Eighth Amendment, to be "reasonably protected from constant threat of violence and sexual assault" by her fellow inmates).  After all, female and male inmates are not housed together in prisons because this risk is not only self-evident, but serious and real.

The parties also do not dispute that Mrs. Pichardo sufficiently alleged the third element, causation.  It is the second element of an Eighth Amendment claim—the defendants' deliberate indifference to a substantial risk of serious harm—that forms the crux of the matter at hand.  Specifically, both Nurse Harris and Dr. Rodriguez-Garcia primarily argue that they cannot be liable under the Eighth Amendment because Mrs. Pichardo (1) did not allege that they had the required actual, subjective knowledge that she was a woman, and (2) then knowingly disregarded the risk associated with wrongfully reclassifying her as a male.  We disagree.

To satisfy the second deliberate indifference element, a plaintiff must sufficiently allege that the defendant actually (subjectively) knew that an inmate faced a substantial risk of serious harm.  Caldwell, 748 F.3d at 1099–1100.  The Supreme Court in Farmer held that the prison "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837, 114 S. Ct.

19

at 1979.  This requirement of subjective culpability means that it is not enough for a plaintiff to merely establish that "a reasonable person would have known, or that the defendant should have known" of a substantial risk of serious harm.  Id. at 843 n.8, 114 S. Ct. at 1982 n.8.

It is true that the defendants must have had actual, subjective knowledge that Mrs. Pichardo was a female.  However, even under this subjective standard, a prison official cannot hide behind an excuse that he was unaware of a fact or risk if that fact or risk would have been obvious to anyone.  Id. at 842–43, 114 S. Ct. at 1981–82.  This is because the subjective standard can be proven with circumstantial evidence:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that a risk was obvious.

Id. at 842, 114 S. Ct. at 1982 (citations omitted).  In addition, a prison official's subjective knowledge can be proven through circumstantial evidence showing that, for example, the substantial risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it."  Id. at 842–43, 114 S. Ct. at 1981–82 (internal quotations omitted).

20

Importantly to this case, while a prison official may show that the obviousness of a risk escaped him, he cannot escape liability "if the evidence show[s] that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." Id. at 843 n.8, 114 S. Ct. at 1982 n.8 (emphasis added); see also Goebert, 510 F.3d at 1328 ("Choosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness.").

With these principles in mind and viewing the allegations in a light most favorable to Mrs. Pichardo, we conclude that the extensive facts alleged in the second amended complaint give rise to the inference that, at a minimum, Nurse Harris and Dr. Rodriguez-Garcia "strongly suspected" that Mrs. Pichardo was a female but "refused to verify the underlying facts" that would prove her female gender to be true. They then (1) deliberately reclassified Mrs. Pichardo's gender as male, in the face of the contrary evidence that she was a woman, and (2) knew that reclassifying her as male would send her to the male jail population where her safety and life would be at risk. This amounts to deliberate indifference under Farmer. 511 U.S. at 843 n.8, 114 S. Ct. at 1982 n.8.

To begin with, Mrs. Pichardo appeared to be a woman. Both Officers Audrey Mormon and Kimberly Jones interacted with Mrs. Pichardo and said that she appeared to be female. And during initial booking, a female officer, who was

21

responsible for determining Mrs. Pichardo's gender, strip searched Mrs. Pichardo and determined that she was a woman. If Mrs. Pichardo had a penis and testicles, the officer would have discovered them during the strip search. But she did not. Instead, the female officer looked at Mrs. Pichardo's entire body and "did not notice anything abnormal."

That Mrs. Pichardo was a woman was also well-documented and expressly noted by prison officials. First, Mrs. Pichardo's arrest warrant said she was female. As for prison records, Mrs. Pichardo was classified as female at booking and housed with the female inmates. Her file specifically reported that she was female, that she had been strip searched at intake, and that she was taking hormone replacement therapy for menopause. In turn, both Nurse Harris and Dr. Rodriguez-Garcia reviewed Mrs. Pichardo's medical file before seeing her, which listed her sex as female. Both medical personnel also noticed that Mrs. Pichardo was taking hormone replacement pills, which they knew women take to treat menopause symptoms.

As to Nurse Harris specifically, the circumstances show that Nurse Harris was exposed to consistent and repeated information that Mrs. Pichardo was a woman. First, Mrs. Pichardo told the nurse that she was a woman and had all of her "female parts." Officer Audrey Morman repeatedly informed Nurse Harris that Mrs. Pichardo was a woman and reminded her that she had been strip searched at

booking and classified as female.  Similarly, Officer Kimberly Jones asked Nurse Harris no fewer than three times if she had strip searched or physically examined Mrs. Pichardo before claiming that she was a man because the officer was concerned Mrs. Pichardo was a woman.

Nevertheless, in the face of all of this evidence that Mrs. Pichardo was female, Nurse Harris refused to physically examine Mrs. Pichardo or to ask Dr. Rodriguez-Garcia to physically examine her before reclassifying her as a man. Not only did she stubbornly refuse to confirm Mrs. Pichardo's sex, she intentionally lied to Officer Morman about it, indicating to the officer that Mrs. Pichardo had a penis and testicles.  In response to this lie, Officer Morman again told Nurse Harris that Mrs. Pichardo looked like a woman.

Further, Nurse Harris refused even to engage with Officer Jones's multiple questions about whether Mrs. Pichardo had been strip searched to see if she was male.  Instead, Nurse Harris simply said "she's a man" and walked away.  Nurse Harris then filled out a health services incident addendum that identified Mrs. Pichardo as "[t]ransgender, male parts, female tendencies" despite knowing that reclassifying Mrs. Pichardo as male would send her to the male population where her safety and life would be at risk.  These allegations state a plausible claim of deliberate indifference.

23

As to Dr. Rodriguez-Garcia, the factual circumstances also show that he too had clear information that Mrs. Pichardo was a woman. Prior to seeing Mrs. Pichardo, he reviewed her pre-screening medical documentation, which noted that she was "Menopause Medical" and taking hormone replacement pills. Thus, medical records expressly showed that Mrs. Pichardo's hormone replacement therapy was related to menopause and not to gender transitioning. Further, Mrs. Pichardo came to the medical unit due to her history of high blood pressure. No one sent her there for a gender evaluation. And of course when she arrived in the medical unit, she was wearing the orange uniform that female inmates wear.

Nevertheless, Dr. Rodriguez-Garcia took it upon himself to reclassify her biological sex without physically examining her. Indeed, Mrs. Pichardo's file clearly reported that she had been strip searched during booking and classified as female. This is why Mrs. Pichardo was booked in the female jail in the first place.

Moreover, like Nurse Harris, Dr. Rodriguez-Garcia knew that sending a woman to an all-male prison would pose a risk of serious harm to her safety, however, he took no steps at all to verify Mrs. Pichardo's sex before reclassifying her as male. First, Dr. Rodriguez-Garcia did not physically examine Mrs. Pichardo undressed or conduct a strip search, which he knew was the proper procedure for determining an inmate's sex. He also did not ask her if she was male, female, or

24

transgender.  And he intentionally did not ask her why she was taking hormone replacement pills and explained later that it was "a difficult question to ask."

What he did ask Mrs. Pichardo was "in a general sense if she had all [of her] 'sex parts.'"  But the answer to that question did not tell Dr. Rodriguez-Garcia anything about whether Mrs. Pichardo was a man or a woman.  These allegations support a reasonable inference that despite his assumption otherwise, Dr. Rodriguez-Garcia "strongly suspected" that Mrs. Pichardo was in fact female and "refused to verify underlying facts" that would prove her female gender to be true.  See Farmer, 511 U.S. at 843 n.8, 114 S. Ct. at 1982 n.8.

Here, Nurse Harris's and Dr. Rodriguez-Garcia's choosing to deliberately disregard the wealth of information that Mrs. Pichardo was female—the fact that she was strip searched, booked as female, and appeared to be female—and reclassifying her as male without any investigation or physical exam is sufficient to show that they "refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist."  Id.  Accordingly, Mrs. Pichardo's allegations state a plausible § 1983 claim of deliberate indifference against Nurse Harris and Dr. Rodriguez-Garcia sufficient to survive a motion to dismiss.  The district court erred in concluding otherwise.

### C. Clearly Established Law

Having determined that Mrs. Pichardo plausibly alleged that Nurse Harris's and Dr. Rodriguez-Garcia's conduct violated the Eighth Amendment, we turn to "whether the Eighth Amendment right at issue 'was clearly established such that a reasonable [prison] official would understand what he [or she] is doing violates that right.'" Brooks v. Warden, 800 F.3d 1295, 1306 (11th Cir. 2015) (quoting Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)).

To determine whether a right is clearly established, we ask whether it would be clear to a reasonable prison official that his or her conduct was unlawful in the situation confronted. See Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) (recognizing that "fair and clear notice" is the cornerstone of the qualified immunity analysis). There are several ways to assess whether a right is clearly established. See id. at 1350–53. First, the plaintiff can point to a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the relevant state supreme court. See J W ex rel. Tammy Williams v. Birmingham Bd. of Educ., 904 F.3d 1248, 1259–60 (11th Cir. 2018). "Second, the plaintiff can identify a broader, clearly established principle that should govern the novel facts of the situation." Id. Third, even in the absence of factually similar case law, prison officials can have fair warning that their conduct is unconstitutional when the constitutional violation is obvious, sometimes referred

26

to as "obvious clarity" cases.  See United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227 (1997); Vinyard, 311 F.3d at 1350–51.

We conclude that at the time of this incident in 2013, every reasonable prison officer and medical personnel would have known that wrongfully misclassifying a biological female as a male inmate and placing that female in the male population of a detention facility was unlawful.  The conduct at issue here lies so obviously at the very core of what the Eighth Amendment prohibits, that the unlawfulness of placing a female detainee within the male population was readily apparent to any prison officer or medical personnel in the shoes of Nurse Harris and Dr. Rodriguez-Garcia.  Accordingly, neither is entitled to qualified immunity.

## V.  CONCLUSION

For the foregoing reasons, we conclude that Mrs. Pichardo may proceed with her § 1983 deliberate indifference claims against Nurse Harris and Dr. Rodriguez-Garcia.  We therefore reverse the district court's order as it relates to the federal claims against Nurse Harris and Dr. Rodriguez-Garcia and remand for further proceedings consistent with this opinion.

**REVERSED IN PART AND REMANDED.**