[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-11460
_____

D.C. Docket No. 1:18-cv-02163-MLB


ONREE NORRIS,

                                                              Plaintiff-Appellant,


versus


JERMAINE HICKS,
DAVID CODY,
DAVID LEMACKS,
JEROME MOORE,
STEVEN PARRISH, et al.,

                                                              Defendants-Appellees.

——————————————

Appeal from the United States District Court
for the Northern District of Georgia

——————————————

(May 5, 2021)

Before BRANCH, GRANT, and TJOFLAT, Circuit Judges.

PER CURIAM:

This appeal arises from the execution of a no-knock search warrant at an incorrect address. Officers executed the warrant at 303 English Road in McDonough, Georgia, the home of Onree Norris, but they should have executed it at 305 English Road, the house next door—which was reportedly the home of Gemar Watkins, a known violent drug dealer. Because of the high-risk nature of executing the search warrant on Watkins's home, two teams including over 24 law enforcement officers participated in the execution of the warrant. Officers initially approached 305 English Road but thought it was not the target of the warrant because it was an abandoned, dilapidated, uninhabitable "storage out-building" and officers understood the target to be an occupied, "normal" home. Unfortunately for Norris, the team of officers then mistakenly thought his home, approximately 40 yards away, was the actual target and raided it.

Norris filed suit under 42 U.S.C. § 1983 against Capt. David Cody and other officers involved in the execution of the warrant, alleging a violation of his Fourth

Amendment rights.[1]  The district court granted Capt. Cody's motion for summary judgment because it found that he was entitled to qualified immunity from Norris's claims.

Norris appeals from the district court's grant of summary judgment and argues that Capt. Cody violated his clearly established rights based on his role in the mistaken execution of the search warrant.  Because we agree that Capt. Cody did not violate clearly established law, we affirm the district court's grant of summary judgment.  Norris also appeals from the district court's denial of his motion to amend his complaint to add another defendant, Agent Eric Kendig, after the amendment deadline had passed.  Because the district court's denial of Norris's motion was not an abuse of discretion, we also affirm that decision.

## I.    Background

Two law enforcement groups were involved in the execution of the search warrant at Norris's house.  First, the Flint Circuit Drug Task Force—a group comprised of agents from several different law enforcement agencies that specializes in drug-related investigations—performed the initial investigation of Watkins and obtained a search warrant for 305 English Road.  Second, the Henry

---

[1]  Norris also sued Jermaine Hicks, David Lemacks, Jerome Moore, Stephen Parrish, and other unidentified officers.  Norris agreed below that Hicks, Lemacks, Moore, and Parrish were entitled to qualified immunity on his claims, so the only claim remaining on appeal is the claim against Cody.

County Sheriff's Office Special Response Team—a group of 21 agents that specializes in executing search and arrest warrants—assisted the Task Force with the execution of the search warrant because the Task Force anticipated the execution to be especially dangerous.[2]  Former defendants Hicks, Lemacks, Moore, and Parrish are Task Force agents, and Capt. Cody is the Commander of the Response Team.

### A.    The Task Force Investigation

The Task Force began investigating Watkins after receiving numerous tips in 2016 and 2017 that he was selling drugs from his home at 305 English Road.  In addition to those reports, the Task Force was informed that Watkins had pointed a gun at, and threatened to kill, two parents who confronted him at his home after he sold drugs to their son.  In early 2018, a confidential informant reported to the Task Force that: (1) he regularly purchased drugs from Watkins at 305 English Road; (2) Watkins and his associates carry guns at the residence; (3) Watkins's friends and family live nearby and warn Watkins when police are around; (4) Watkins uses surveillance cameras at his house; and (5) that "everyone is scared of [Watkins] because he has a violent reputation and constantly threatens people with being shot."  Task Force agents also obtained a video from Watkins's social media

---

[2]  The Task Force believed the execution of the warrant would be especially dangerous because of its prior attempts to surveil the property, the counter-surveillance measures Watkins had in place, and Watkins's violent reputation.

account in which Watkins and an associate are depicted using a firearm to threaten and assault an elderly man.

But investigating Watkins's home was no easy feat. In September 2017, the Task Force tried to conduct surveillance at 305 English Road but were immediately chased away by three or four people standing in front of the property. Specifically, men at the property got in a car and followed the two Task Force agents at a high speed, "pretty much" bumper-to-bumper, for about five to ten miles. Based on his view of the property during the surveillance attempt, one of the Task Force agents believed the home at 305 English Road looked "rundown" but "habitable" and "typical to the other houses in the area."

In late January 2018, two Task Force agents drove by 305 English Road and saw seven or eight people there, someone standing on the front porch, and several abandoned cars and car parts scattered in the yard. One Task Force agent described this drive-by surveillance as "lucky" because the property was usually too dangerous for officers to visit. Based on this drive-by, agents testified the house's exterior siding was "off-white," the roof was black, "it looked like an active residence, and did not appear to be abandoned in any manner."

After using a confidential informant to complete a controlled purchase at 305 English Road, one of the Task Force agents obtained a no-knock search warrant for the property. The warrant described 305 English Road as "a one story

5

single-family residence, with off white siding," "a black roof," and a "black mailbox on a wooden post" displaying the address and Watkins's name.

## B.    Pre-Execution Briefing

After obtaining the warrant, the Task Force sought assistance from the Response Team due to the anticipated "violence threat" involved in executing the warrant. No one from the Response Team, including Capt. Cody, had been to 305 English Road previously. While the Response Team usually conducts drive-by surveillance of a target property before executing a warrant, it was unable to do so here because of the safety risks involved and the risk of getting spotted by Watkins and his associates.

On February 8, 2018, agents from the Task Force and the Response Team—including Capt. Cody—met to prepare to execute the search warrant. Agent Hicks, a Task Force Agent, delivered a PowerPoint presentation to everyone involved in the execution of the warrant (including all 21 Response Team agents) that included an aerial image of the home's location on a map, driving directions to the home, an overview of events leading to the search warrant, and Watkins's profile. The presentation also warned the agents that several people with firearms might be present and that Watkins had children.

During the presentation, Agent Hicks described 305 English Road as Watkins's residence, "off-white" in color, with broken-down cars in the yard. He

6

also stated that the search warrant, which included a more detailed description of Watkins's home, was "available for review," but he testified that he did not recall anyone reviewing the search warrant at the briefing nor any Response Team agent reviewing the warrant before the briefing.  Capt. Cody testified that he reviewed the search warrant to make sure it was signed, confirmed it authorized no-knock entry, and confirmed the address matched the address used in the PowerPoint presentation, but admitted that he did not read it "all the way through."[3]  Because the Task Force was responsible for ensuring the Response Team knew the target's location and the Response Team relied on the Task Force to describe the target property and to take them to it, Capt. Cody explained that typically he does not review the warrant's property description before completing a raid.

Agent Hicks explained during the briefing that the Task Force was responsible for securing the grounds around the target residence and vehicles in the yard while the Response Team was responsible for entering and securing the house.  Capt. Cody was the leader of the Response Team and exercised "overall

---

[3]  For the first time in Norris's reply brief, he argues that whether Capt. Cody read the search warrant is a disputed fact based on Agent Hicks's testimony that he did not recall any other officers asking to look at the search warrant during the briefing.  We generally do not consider issues raised for the first time in an appellant's reply brief.  *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (explaining that generally, we will not consider an issue not raised in the district court for the first time on appeal); *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1328 (11th Cir. 2004) ("[A] party cannot argue an issue in its reply brief that was not preserved in its initial brief." (quotation omitted)).  In any event, whether Capt. Cody reviewed the search warrant is not determinative of whether he is entitled to qualified immunity.

tactical control," but he delegated authority to Agent Kendig to control the Response Team's movement into the house. After Agent Hicks finished his presentation, Capt. Cody provided tactical instructions to the agents so that everyone understood their role in the operation.

### C.    Executing the Search Warrant

After the briefing, the Response Team, including Capt. Cody, followed two Task Force agents to 305 English Road. The sun was setting when they arrived. Several Task Force Agents drove separately to the woods surrounding the target property to look for and apprehend anyone fleeing the target residence. The agents knew there was another "drug house" in the area so they were worried about people running between the two houses.

Capt. Cody wore a body camera which recorded video showing the Response Team, dressed in tactical gear and holding weapons, pull up on a dirt path leading to the side of 305 English Road. The footage shows that the house had abandoned cars and parts scattered around the dirt yard. After exiting their vehicles, the agents threw two flash grenades near the house that created a bright flash, followed by smoke and a loud noise. Agents testified that they threw the grenades to distract and disorient the people with weapons they expected to encounter at the property.

Immediately after the explosions, a few agents approaching from the front of the house apprehended and handcuffed a man in the yard. The rest of the Response Team, led by Capt. Cody, walked towards the side of the house with their guns raised. Though the state of the house was not apparent from a distance, as they got closer to it, Capt. Cody and Agent Kendig realized it was severely run down and dilapidated. The house had holes on the exterior, car parts laying inside, and it had no windows, doors, electricity, running water, appliances, carpet, or sheet rock walls. Capt. Cody and Agent Kendig believed it was uninhabitable, abandoned, and a "storage out-building" rather than a house. Because Capt. Cody and Agent Kendig understood the search warrant was for an occupied residence, they mistakenly concluded the structure was not 305 English Road.

As the group moved through the backyard of 305 English Road, the video shows that Capt. Cody slowed down and the rest of the Response Team continued past him through some trees. While Capt. Cody hung back, a group of Response Team agents deployed two flash grenades and then forcibly entered a nearby yellow house whose lights were on and apprehended Norris, who was inside.[4] All

---

[4] The video shows that the Response Team arrived at Norris's residence very quickly after the raid began. After spending about thirty seconds walking towards and behind 305 English Road, the team continued past it to the second house. The team never stopped moving and never communicated by radio with Capt. Cody or anyone else. Capt. Cody testified that the Response Team normally does not communicate over the radio during an operation until after they secure a house for safety reasons.

9

of these events occurred within approximately a minute and a half of the officers' arrival on the scene.

Norris's house was approximately forty yards from 305 English Road, separated only by a few trees. The house, like 305 English Road, sat on a large grassy dirt clearing surrounded by trees. The video shows that the color and design[5] of the two houses have some similarities, but Norris's home was yellow while 305 English Road was a slightly lighter off-white color. Capt. Cody testified that sometime during the briefing he had been told the target residence was yellow, but he could not remember who told him this fact.[6]

Capt. Cody followed the rest of his team into Norris's home less than a minute after they entered. Capt. Cody testified that at that point, he "wasn't sure" this second house was the target residence, but "[t]hings were moving really fast" and he assumed Agent Kendig and the rest of the team had "acquired information that justifiably led them to proceed to the second structure." Shortly after the Response Team mistakenly entered Norris's house, Task Force agents informed them that they had raided the wrong house. Capt. Cody later worked with Norris to repair the damage caused by the agents to his home.

---

[5]  Both structures appear from the video to be one story, single-family houses with brick pillars and covered with siding of a similar material.

[6]  Agent Hicks testified that, during his presentation at the briefing, he told the officers that the target residence was "off-white," not yellow.

### D.    Lawsuit

In May 2018, Norris sued Capt. Cody and several Task Force agents under 42 U.S.C. § 1983 for searching his home and seizing his person without a search warrant or probable cause in violation of the Fourth, Fifth, and Fourteenth Amendments.[7]  On April 1, 2019, about two months after discovery closed and almost a year into the case, Norris moved to amend his complaint to add Agent Kendig as a defendant.  The next day, the defendants moved for summary judgment based on qualified immunity.  In response, Norris agreed that the Task Force agents he sued were entitled to qualified immunity, but Norris maintained that Capt. Cody was not entitled to immunity because he violated clearly established law as "any reasonable officer in Cody's position would understand that entering, and allowing his subordinates to enter, [Norris's] home would violate the law."

The district court denied as untimely Norris's motion to amend his complaint to add Agent Kendig as a defendant.  Because Norris moved to amend his complaint more than seven months after the scheduling order deadline for

---

[7]  The district court determined that Capt. Cody was entitled to summary judgment on Norris's Fifth and Fourteenth Amendment claims because Norris's allegations "center on an unlawful search and seizure and should be analyzed under the Fourth Amendment, not the due process clauses of either the Fifth or Fourteenth Amendment."  Norris does not challenge this holding and his arguments on appeal relate to his Fourth Amendment claim.  Accordingly, we only address Norris's Fourth Amendment claim.

amendments passed, the district court analyzed his request under Federal Rule of Civil Procedure 16(b)'s stringent good cause standard and found that Norris failed to show good cause for not moving to amend his complaint earlier in the proceedings. The district court pointed out that Norris obtained significant information about Agent Kendig's involvement in the raid months before he sought to amend his complaint.

The district court then granted Capt. Cody's motion for summary judgment because it found that Norris failed to meet his burden to show that Capt. Cody's involvement in the raid violated clearly establish law. Specifically, the district court found that the case Norris relied on to establish that Capt. Cody violated clearly established law, *Hartsfield v. Lemacks*, 50 F.3d 950 (11th Cir. 1995), differed materially from this case. The court outlined seven key factual differences between *Hartsfield* and this case to support its conclusion. This appeal followed.

## II.    Discussion

On appeal, Norris argues that the district court erred in finding that Capt. Cody was entitled to qualified immunity because Capt. Cody violated clearly established law during the mistaken raid of Norris's home. He also argues that the district court abused its discretion in denying his motion to amend his complaint to add Agent Kendig as a defendant. We address each argument in turn.

## A.    Qualified Immunity

We review the district court's grant of summary judgment based on qualified immunity *de novo*. *Crocker v. Beatty*, 886 F.3d 1132, 1136 (11th Cir. 2018). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We accept Norris's version of the facts as true and draw all reasonable inferences in his favor. *Crocker*, 886 F.3d at 1134.

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[8] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This immunity allows government officials "to work without fear of liability, protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"To overcome a qualified immunity defense, the plaintiff must make two showings." *Id.* "First, []he 'must establish that the defendant violated a constitutional right.'" *Id.* (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189,

---

[8] Norris does not dispute that Cody was performing a discretionary function during the raid. *See Hartsfield*, 50 F.3d at 953 (explaining that officers executing a search warrant at the wrong address were "no doubt" acting "within their discretionary authority").

1199–1200 (11th Cir. 2007)).  Second, he must demonstrate that "the violated right was 'clearly established.'"  *Id.*  Courts can determine which prong to assess first "in light of the circumstances in the particular case at hand."  *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

In determining whether the violated right was clearly established, "[e]xact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law."  *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011); *see also Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015) ("Minor variations in some facts . . . might be very important and, therefore, be able to make the circumstances facing an official materially different than the pre-existing precedents[.]"(quotation omitted)).  Rather, in this case, "[t]he critical inquiry is whether the law provided [Capt. Cody] with 'fair warning' that his conduct violated the Fourth Amendment."  *McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir. 2007) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  This inquiry is undertaken "in light of the specific context of the case, not as a broad general proposition."  *Coffin*, 642 F.3d at 1013 (quotation omitted).  "Such specificity is especially important in the Fourth Amendment context, where the Supreme Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."  *Williams ex rel. J W v. Birmingham Bd. of Educ.*, 904 F.3d

14

1248, 1260 (11th Cir. 2018) (quotation omitted; alterations adopted). In determining whether the law was clearly established at the time of the alleged violation, we look only to binding precedent, which consists of cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose. *Coffin*, 642 F.3d at 1013.

A "'basic principle of Fourth Amendment law' [is] that searches and seizures inside a home without a warrant are presumptively unreasonable." *Hartsfield*, 50 F.3d at 954 (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). It is undisputed that the officers did not have a warrant or probable cause to search Norris's home. But a warrantless search of a home based on an officer's mistake does not violate the Fourth Amendment where the officer's "conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *Maryland v. Garrison*, 480 U.S. 79, 88–89 (1987).

To establish that Capt. Cody's conduct during the raid violated clearly established law, Norris points to the Supreme Court's decision in *Garrison* and our decision in *Hartsfield*.[9] In *Garrison*, the Supreme Court considered the

---

[9] Norris also points to *Treat v. Lowe*, 668 F. App'x 870 (11th Cir. 2016), an unpublished, non-binding case that he argues establishes that Capt. Cody violated clearly established law. But Norris cannot rely on this case to meet his burden. *See Coffin*, 642 F.3d at 1013 (explaining that we look only to binding precedent to determine clearly established law).

constitutionality of an accidental search of the wrong apartment. There, officers obtained a search warrant for the "third floor apartment" of a particular complex. 480 U.S. at 80. When the police applied for the warrant and conducted the search, they reasonably believed that there was only one third floor apartment "based on a verification of information obtained from a reliable informant, an exterior examination of the three-story building . . . , and an inquiry of the utility company." *Id.* at 81. In fact, there were two different apartments on the third floor of the complex, and police officers began searching the wrong one while executing the warrant and found illegal drugs. *Id.* at 80. The defendant moved to suppress the evidence discovered during the mistaken search of his apartment. *Id.* at 80–81. The Supreme Court held that the evidence was not required to be suppressed under the Fourth Amendment because "the officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *Id.* at 88–89. The Court further explained, however, that "[i]f the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to [the target] apartment." *Id.* at 86. We later acknowledged that after *Garrison*, "it was . . . clearly established law that, absent probable cause and exigent circumstances, a warrantless search of a

16

residence violates the Fourth Amendment, unless the officers engage in reasonable efforts to avoid error." *Hartsfield*, 50 F.3d at 955.

In *Hartsfield*, we considered whether *Garrison* clearly established that an officer violated the Fourth Amendment when he mistakenly led his team to the wrong residence to execute a search warrant. *Id.* at 951–52. Before obtaining a search warrant, the officer in *Hartsfield* accompanied a confidential informant to the target residence to purchase marijuana. *Id.* at 951. The officer stayed in his car while the informant made the purchase. *Id.* Later that same day, the officer obtained a search warrant for the target residence. *Id.* The next afternoon, that same officer mistakenly led law enforcement agents to the wrong house to execute the search warrant. *Id.* at 951–52. He forcibly opened the door to the plaintiff's home with a battering ram and other agents went inside. *Id.* at 952. The plaintiff sued that officer and other officers involved in the raid under 42 U.S.C. § 1983 for violating his Fourth Amendment rights. *Id.* While we held the other officers involved in the raid were entitled to qualified immunity, we also held that the officer who obtained the warrant and led the officers to the wrong house was not entitled to qualified immunity. *Id.* at 955, 956. We emphasized that the lead officer had been to the target home the day before the raid, the lead officer had the warrant in his possession but did not check to make sure he was leading the officers to the correct address, the numbers on the house were clearly marked, the

17

raid took place in the daylight, and the target residence and the residence searched were "distinguishable." *Id.* at 955. The target house—5108 Middlebrooks—was a corner house on a dead-end street with junk cars reportedly strewn outside. *Id.* In contrast, the searched house—5128 Middlebrooks—was further down the block, separated by at least one other house, and had a fence around it. *Id.* at 952.

Based on these facts, we held that *Garrison* clearly established that an officer who "[does] *nothing* to make sure that he was leading the other officers to the correct residence" to execute a search warrant was not entitled to qualified immunity. *Id.* at 955 (emphasis added). While we recognized "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants," we found the lead officer's actions in *Hartsfield* were not "consistent with a reasonable effort to ascertain and identify the place intended to be searched" as dictated by *Garrison.* *Id.* (quoting *Garrison*, 480 U.S. at 87–89).

We must determine whether Capt. Cody's actions during the raid—not commanding his team to stop heading towards Norris's home and then following his team into Norris's home—violated the law clearly established in *Garrison* and *Hartsfield*. To do so, we "compare the facts of the case before [us] with those cases that [Norris] contends show the clearly established nature of the law." *Merricks*, 785 F.3d at 559.

18

Norris asserts that this case is like *Hartsfield* because: (1) the raids were carefully staged and there were no exigent circumstances or probable cause to enter the properties the officers entered; (2) the target residence and the plaintiff's residence were different colors and physically distinguishable; and (3) Capt. Cody had "seen" the search warrant prior to the raid like the officer in *Hartsfield*. While there are some basic similarities between *Hartsfield* and this case, we agree with the district court that the factual differences are significant enough that our prior precedent did not clearly establish that Capt. Cody's conduct violated Norris's rights during the mistaken execution of the raid.

Unlike the officer in *Hartsfield*, who had been to the target residence previously but did nothing to ensure that he led the other officers to the correct address, Capt. Cody was not involved in the preliminary investigation of Watkins and the target property and had never seen the target property before executing the warrant. Rather, Capt. Cody was brought in as a specialist to help execute the warrant and relied on the briefing of the Task Force, which was responsible for the preliminary investigation and leading the Response Team to the target residence. During the Task Force briefing, the Task Force described the target residence,

showed an aerial picture of the target residence, and displayed the proper target address.[10]

Further, in *Hartsfield*, the officer went directly to the wrong residence, whereas in this case, Capt. Cody and the Response Team initially went to the correct address based on their briefing.  However, when they arrived at the residence, it did not match the description from the Task Force briefing because the house had been abandoned and looked like a "storage out-building" rather than a habitable residence, as the briefing explained.  This mismatch led members of the Response Team to conclude that the house next door, Norris's house, must be the actual target residence.

The situation facing Capt. Cody was also different than the situation facing the officer in *Hartsfield* because of the anticipated dangers at Watkins's house—the target residence.  Unlike the relative ease of surveilling the target residence in *Hartsfield*, officers attempting to gather information had been chased from the vicinity of Watkins's home.  Officers had also received numerous reports of guns, violence, lookouts, and Watkins's violent prior actions before executing the warrant.  During the pre-execution briefing, Capt. Cody and the Response Team learned of Watkins's dangerous nature, the possibility of multiple people with

---

[10] A picture or drive-by view of the target residence was not available to Capt. Cody because of the difficulties and dangers in surveilling the property.

20

firearms at the target property, the risk of nearby "lookouts" and people fleeing to nearby houses, and the possibility that children could be present at the target property, enhancing the danger and sensitivity of executing the warrant in a safe and timely manner.

Simply put, this case was not a situation envisioned by *Garrison* where Capt. Cody failed to engage "in reasonable efforts to avoid error" or a situation like in *Hartsfield* where the officer did "nothing" to avoid the mistake. Rather, Capt. Cody and the other officers involved carefully planned a high-risk raid at what was thought to be a dangerous target house but made a mistake when faced with an unexpected circumstance—the residence not matching the description given. The team was especially limited in their ability to respond to this unexpected circumstance because they had "announced" their presence with flash grenades, it was unsafe to communicate via radio, and they were forced to make a split second decision. Our precedent allows some latitude for such "honest mistakes . . . made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Hartsfield*, 50 F.3d at 955 (quoting *Garrison*, 480 U.S. at 87). While the mistaken raid of Norris's home was no doubt traumatic, given the significant factual differences between Capt. Cody's actions in the raid and our prior precedent, we agree with the district court that Norris failed to meet his burden to show that Capt. Cody violated clearly established law.

21

B.    **Motion to Amend**

Norris argues the district court abused its discretion in denying his motion to amend his complaint to add Agent Kendig as a defendant. Norris asserts that he demonstrated good cause for the amendment because the evidence supporting the proposed claim against Agent Kendig "could not have been and was not discovered in the exercise of reasonable diligence" until after the amendment deadline had passed.

"The decision whether to grant leave to amend is committed to the sound discretion of the trial court," and we review a district court's denial of a motion for leave to amend for abuse of discretion. *Shipner v. E. Air Lines, Inc.*, 868 F.2d 401, 406–07 (11th Cir. 1989); *see also Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1231 (11th Cir. 2008). "A district court has not abused its discretion when the court has 'a range of choices' and the court's choice 'does not constitute a clear error of judgment.'" *Vanderberg v. Donaldson*, 259 F.3d 1321, 1326 (11th Cir. 2001) (quotation omitted).

After the time for amendment as a matter of course has expired, a plaintiff may only amend her complaint with "the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Although "[t]he court should freely give leave when justice so requires," *id.*, it may deny leave on "numerous grounds" such as "undue delay, undue prejudice to the defendants, and futility of the

amendment." *Abramson v. Gonzalez*, 949 F.2d 1567, 1581 (11th Cir. 1992). Further, because Norris filed his motion after the scheduling order's deadline for amendments, he must show good cause why the district court should have modified its scheduling order to grant him leave to amend his complaint. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998) (per curiam) ("If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure.").

The district court found that Norris was "not diligent" and did not demonstrate good cause to modify the court's scheduling order. The district court set August 26, 2018 as the deadline for amendments to the pleadings. On April 1, 2019, over seven months after the pleading amendments deadline had passed and almost a year after the case was filed, Norris moved to amend his complaint to add Agent Kendig as a defendant. Norris argues he had good cause for this delay because he did not learn of Agent Kendig's role in the operation until after the amendment deadline passed. But the district court pointed out that Norris obtained "significant information" about Kendig's involvement earlier in the case and still waited months to seek the amendment. For instance, more than four months before

23

moving to amend, Norris learned from Capt. Cody's deposition that Agent Kendig was the "entry team leader" to whom Capt. Cody delegated authority to "control" the Response Team's movement to the house.  Though Norris did not depose Agent Kendig until later, he knew of Agent Kendig's role in the raid months earlier.  Under these circumstances, the district court did not abuse its discretion in denying Norris's motion.

### III.    Conclusion

For these reasons, we affirm the district court's grant of summary judgment to Capt. Cody and its denial of Norris's motion to amend his complaint.

**AFFIRMED.**